**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **NERLENS NOEL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-cv-2485** |
| | § | |
| **RICHARD PAUL and KLUTCH** | § | |
| **SPORTS GROUP, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT THEREOF**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**MOTION** ................................................................................................................................ 1

**BRIEF** .................................................................................................................................... 1

**I.**   **Introduction** ............................................................................................................... 1

**II.**  **Statement of Facts** ..................................................................................................... 2

    *A.*  *The Parties* ........................................................................................................ 2

    *B.*  *Relevant Factual Allegations* ........................................................................... 3

**III.** **Argument and Authorities** ...................................................................................... 10

    *A.*  *Noel's Agreement to Arbitrate is Enforceable under the Federal Arbitration Act* ..... 10

        1.   The SPAC Involves Interstate Commerce ............................................ 11

        2.   The Agreement to Arbitrate is Valid Under General Contract Principle .............. 12

    *B.*  *Noel's Claims Against Paul Must be Arbitrated and Are Already Pending in Arbitration* ........................................................................................................ 13

    *C.*  *Noel's Claims Against KSG Must Be Arbitrated* ........................................... 15

    *D.*  *All Claims Must Be Compelled to Arbitration and This Lawsuit Should be Dismissed* ....................................................................................... 17

    *E.*  *In the Alternative, this Lawsuit Must Be Dismissed Pursuant to Rule 12(b)(2)* ......... 18

        1.   Paul Lacks Sufficient Contacts with Texas to Support Either General or Specific Jurisdiction ......................................................................... 20

        2.   KSG Lacks Sufficient Contacts with Texas to Support Either General or Specific Jurisdiction ......................................................................... 21

**IV.**  **Conclusion** ............................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allied-Bruce Terminix Cos. v. Dobson,*
   513 U.S. 265 (1995)...............................................................................11

*Arciniaga v. Gen. Motors Corp.,*
   460 F.3d 231 (2d Cir. 2006)...............................................................11

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011)...............................................................................11

*Aviles v. Kunkle,*
   978 F.2d 201 (5th Cir. 1992) ........................................................20, 22

*BNSF Railway Co. v. Tyrrell,*
   137 S.Ct. 1549 (2017)......................................................................21-22

*Breathwit Marine Contractors, Ltd. v. Deloach Marine Services, LLC,*
   994 F. Supp. 2d 845 (S.D. Tex. 2014) ............................................ 18-19

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)................................................................. 19- 20, 22

*Carroll v. LeBouf, Lamb, Greene & McCrae, L.L.P.,*
   374 F. Supp. 2d 375 (S.D.N.Y. 2005)................................................17

*Choctaw Generation Ltd. v. Amer. Home Assur.,*
   271 F.3d 403 (2d Cir. 2001)............................................................ 15-16

*Companion Prop. & Cas. Ins. Co. v. Palermo,*
   723 F.3d 557 (5th Cir. 2013) ................................................................19

*Convergen Energy LLC v. Brooks,*
   No. 20-cv-3746, 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020) ................................ 13, 16-17

*Daimler AG v. Bauman,*
   571 U.S. 117 (2014)...............................................................................19

*Daly v. Citigroup Inc.,*
   939 F.3d 415 (2d Cir. 2019)..................................................................18

*Dean Witter Reynolds, Inc. v. Byrd,*
   470 U.S. 213 (1985).......................................................................... 17-18

*Dominion Gas Ventures, Inc. v. N.L.S., Inc.*,
   889 F. Supp. 265 (N.D. Tex. 1995) ............................................................ 19-20

*GE Energy Power France SAS, Corp. v. Outokumpo Stainless USA, LLC*,
   140 S. Ct. 1637 (2020) ...............................................................................15

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) ......................................................................................11

*Grigson v. Creative Artists Agency, LLC*,
   210 F.3d 524 (5th Cir. 2000) .......................................................................16

*Helicopteros Nacionales de Colombia v. Hall*,
   466 U.S. 408 (1984) ....................................................................................20

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) .......................................................................19

*Kowalchuk v. Stroup*,
   61 A.D.3d 118 (N.Y. App. Div. 2009) .........................................................12

*Lee v. Engel Burman Grande Care at Jericho, LLC*,
   No. 20-cv-3093, 2021 WL 3725986 (E.D.N.Y. Aug. 23, 2021) ................ 12-13, 16

*Little v SKF Serige AB*,
   2014 WL 710941 (S.D. Tex Feb. 24, 2014) .................................................20

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
   252 F.3d 218 (2d Cir. 2001)........................................................................13

*Preussag Aktiengesellschaft v. Coleman*,
   16 S.W.3d 110 (Tex. App.--Houston [1st Dist.] 2000, no pet.)............................ 20

*Texaco Exploration and Products v. Amclyde Eng. Prod.*,
   243 F.3d 906 (5th Cir. 2001) .......................................................................18

*Volt Information Sciences, Inc. v. Bd. Of Trustees of Leland Standford Junior*,
   489 U.S. 468…………………………………………………………………………11

*Wilson v. Belin*,
   20 F.3d 644 (5th Cir. 1994) .........................................................................20

*World–Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)....................................................................................19

**Statutes**

9 U.S.C. § 1, *et seq*............................................................... 1, 4, 10-11, 14, 17

29 U.S.C. § 159(a) ........................................................................................................3, 4

Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2019) .................................19

**Other Authorities**

Fed. Rules of Civ. Proc. 12(b)(2).........................................................................1, 18, 20

Fed. Rules of Civ. Proc. 12(b)(3).....................................................................................1

## MOTION

Defendants Richard Paul and Klutch Sports Group, LLC hereby move this Court for an order: (i) dismissing this action under Rule 12(b)(3) and compelling the matter to arbitration pursuant to 9 U.S.C. § 3, *et seq.*; or, in the alternative, (ii) dismissing this action under Rule 12(b)(2) for lack of personal jurisdiction. This Motion is supported by the Brief below, and the Appendix hereto.

## BRIEF

### I.   Introduction

Since 1954, the National Basketball Players Association ("NBPA") has been the sole, elected, exclusive bargaining representative of all active players in the National Basketball Association ("NBA"). The NBPA advocates for the best interests of all NBA players. As part of that advocacy, in order to ensure high-quality representation for their members, the NBPA oversees a certification process for all Player Agents. Once certified, the NBPA permits those Player Agents to represent players and engage in salary negotiations on their behalf, subject to certain rules. One such rule is that only individuals (and not entities) may become certified Player Agents. Another such rule is that, prior to said representation, the player and Player Agent must enter into a Standard Player Agent Contract ("SPAC"). Since 1986, all NBA players and Player Agents have executed form SPACs, drafted by the NBPA, all of which contain a provision requiring the NBPA's arbitration process as the exclusive method of dispute resolution.

Defendant Richard Paul ("Paul") is a certified Player Agent and represented plaintiff Nerlens Noel ("Noel") from August 2017 through December 2020. When a dispute arose between the two regarding payments under their SPAC, Paul filed a grievance to initiate the NBPA's arbitration process, as required by the SPAC and the NBPA's rules governing Player Agents. Noel answered Paul's grievance, and initiated his own NBPA arbitration by filing a grievance against

Paul. Shortly thereafter, despite knowing full well that the SPAC he signed—that was drafted by his own union—required him to resolve any disputes with Paul via NBPA arbitration, Noel filed a lawsuit against Paul in the 95th Judicial District Court of Dallas County. Noel's arbitration grievance and state court petition are nearly identical. However, unlike his arbitration grievance, Noel's lawsuit inexplicably also includes Klutch Sports Group, LLC ("KSG") as a defendant. As only individuals can represent NBA players as Player Agents, KSG is not and was never Noel's Player Agent. Indeed, KSG is not a party to the SPAC. Noel's irresponsible actions have no legitimate purpose, and are presumably a publicity stunt and/or designed to burden and inconvenience Paul and KSG. This conduct should not be permitted.

The NBPA—which represents the interests of *Noel*—confirms that the causes of action asserted by Noel in this lawsuit very clearly must be arbitrated. Noel has acknowledged that NBPA arbitration is the proper forum for this dispute, not just by agreeing to be bound by the terms of a SPAC, but also by filing an answer to Paul's grievance and initiating his own NBPA arbitration against Paul prior to filing this lawsuit. These facts further confirm that Noel had no legitimate purpose to file this lawsuit. Separate and apart from Noel's gamesmanship and the pending arbitration, this Court lacks personal jurisdiction over both defendants. For all of these reasons, and as more fully explained below, this lawsuit must be dismissed in its entirety.

## II. <u>Statement of Facts</u>

### A. <u>*The Parties*</u>

1. Defendant Richard Paul is an individual who is a resident of the state of California. *See* Declaration of Richard Paul ("Paul Dec."), Appendix ("App.") 001, ¶ 6. Paul is a certified NBPA Player Agent (discussed more fully below) and was certified by the NBPA in 2012. *See* Declaration of Ronald Klempner ("Klempner Dec."), App. 033, ¶ 26; App. 001 (Paul Dec.), ¶ 4.

2.      Paul is also the founder and Chief Executive Officer ("CEO") of defendant Klutch Sports Group, LLC.  App. 001 (Paul Dec.), ¶ 3.

3.      Paul represents a number of NBA players. Paul procures and negotiates employment and endorsement contracts for the athletes that he represents. App. 001 (Paul Dec.), ¶ 4.

4.      Defendant Klutch Sports Group, LLC is a sports agency based in Los Angeles, California. KSG is a Delaware limited liability company, with its principal place of business in Los Angeles, California. App. 001-002 (Paul Dec.) ¶¶ 3, 19.

5.      Plaintiff Nerlens Noel is an NBA player with the New York Knicks. App. 033 (Klempner Dec.), ¶ 25.

**B.      _Relevant Factual Allegations_**

6.      The NBPA is the sole, exclusive bargaining representative, duly elected in accordance with the National Labor Relations Act ("NLRA"), of all active players in the NBA (including Noel).  The NBPA's function is to advocate for the best interests of players. App. 029 (Klempner Dec.), ¶ 6.

7.      The NBPA delegates a portion of its exclusive bargaining authority to designated "Player Agents," who are permitted to engage in individual salary negotiations with NBA teams on behalf of NBA players, such as Noel, within the confines of both the NBPA Regulations Governing Player Agents (the "NBPA Agent Regulations") and the NBA-NBPA Collective Bargaining Agreement ("CBA").  App. 029 (Klempner Dec.), ¶ 7.

8.      The NBPA Agent Regulations establish a set of rules for certifying and regulating Player Agents and further the NBPA's goal of protecting player interests by ensuring players will

receive high-quality representation.[1] App. 029 (Klempner Dec.), ¶ 8. The NBPA developed the NBPA Agent Regulations with the following objectives in mind:

    a. To establish and enforce minimum requirements to become a certified Player Agent;

    b. To afford each player the opportunity to select a certified Player Agent who, in turn, has agreed to: comply with the NBPA's regulations, represent players as a fiduciary with honesty, competency and loyalty, and act consistent with the player's membership in a collective bargaining unit;

    c. To make available to players a comprehensive disclosure of facts relevant to the ability of a particular agent to represent players as a fiduciary;

    d. To establish and enforce uniform standards of conduct and fiduciary responsibility applicable to all agents; and

    e. To provide players and agents with an expeditious, fair, informal, cost efficient, and exclusive procedure for resolving any disputes regarding their relationship, transactions, or contractual obligations.  App. 041 (NBPA Agent Regulations).

9.    The NBPA decides, in accordance with the procedures set forth in the NBPA Agent Regulations, who may become certified as a Player Agent, and the terms and conditions of their service. Pursuant to the CBA and Section 9(a) of the NLRA, NBA teams may only negotiate with Player Agents certified by the NBPA. App. 029 (Klempner Dec.), ¶ 10.

10.    The NBPA Agent Regulations set forth specific procedures for an individual to become a certified NBPA Player Agent (§ 2) and detailed standards for the conduct of Player Agents (§ 3). App. 029 (Klempner Dec.), ¶ 11.

11.    The requirements for certification are designed to ensure that applicants are qualified to represent NBA players and will act in the best interests of their clients.  To become a

---

[1] The NBPA's authority to establish rules and regulations governing players and their agents is conferred upon it by the NLRA and the NBPA's status under the NLRA as the exclusive bargaining representative for all NBA players. *See* 29 U.S.C. § 159(a) ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment").

certified NBPA Player Agent, an applicant must complete an application in which he or she expressly agrees to comply with and be bound by the NBPA Agent Regulations. An individual who signs an application expressly agrees that he or she has "read the NBPA Regulations Governing Player Agents" and that he or she "voluntarily agrees to comply with and be bound by those Regulations . . . which are incorporated herein by reference and any subsequent amendments that may be promulgated thereto." App. 029-030 (Klempner Dec.), ¶ 12.

12.    Before an applicant is certified as a Player Agent, the NBPA will typically conduct an investigation into his or her qualifications and background, require the applicant to pass a written exam (focused on the relevant provisions of the collective bargaining agreement, the NBPA Agent Regulations, and other relevant matters), and complete a preparation course. Applicants will be denied certification if they cannot complete the requirements of the process or the investigation uncovers that the applicant is unfit to render services to players as a fiduciary. App. 030 (Klempner Dec.), ¶ 12.

13.    Only individuals are allowed to be certified as agents.  Agencies cannot be certified as agents and any conduct of an agency or any employee of an agency affiliated with the certified Player Agent is deemed under the NBPA Agent Regulations to be conduct of the certified Player Agent himself/herself. App. 030 (Klempner Dec.), ¶ 13; App. 058 (NBPA Agent Regulations), § 3A, ¶ 12 (requiring an agent to "[p]roperly monitor and supervise all employees or associates who provide a Player Agent with any services in connection with the representation of a Player. Conduct by an employee or associate of a Player Agent that would violate these Regulations shall be deemed to be conduct of the Player Agent and shall subject that Player Agent to discipline under these Regulations.").

14.     The NBPA Agent Regulations set out standards of conduct for Player Agents, requiring them to "carry out representational services covered by these Regulations with the highest degree of professional competence and integrity" and "take the necessary steps to become knowledgeable about the NBPA's structure, the economics of the industry, applicable Collective Bargaining Agreements, basic negotiating techniques, and all areas of the law relevant to his professional duties."  App. 030 (Klempner Dec.), ¶ 14; App. 062 (NBPA Agent Regulations), §3C. Among other things, the NBPA Agent Regulations prohibit an agent from "failing to advise the Player," "concealing material facts from any Player," and "engaging in unlawful conduct and/or conduct involving dishonesty, fraud, deceit, misrepresentation, or other conduct which reflects adversely on his fitness as a Player Agent or jeopardizes the effective representation of Players." App. 030 (Klempner Dec.), ¶ 14; App. 061 (NBPA Agent Regulations), § 3B, ¶¶ 12-14.

15.     The NBPA Agent Regulations also set forth specifications for the form of contract to be used by NBA players and Player Agents, and require that the parties use a standard form contract drafted by the NBPA, known in the industry as the SPAC. App. 030-031 (Klempner Dec.), ¶ 15.

16.     Both the NBPA Agent Regulations and the SPAC, and any subsequent amendments thereto, were adopted by the NBPA's Board of Player Representatives, the group of NBA players empowered by the NBPA's Constitution & By-Laws to represent players' interest in union matters. The Board of Player Representatives is the highest policymaking body of the NBPA. App. 031 (Klempner Dec.), ¶ 16.

17.     There are numerous disputes every year between (i) NBA players and their Player Agents, (ii) the NBPA and Player Agents, and (iii) Player Agents themselves. Therefore, the NBPA Agent Regulations (§ 5) set forth a comprehensive and exclusive arbitration framework for

the resolution of all such disputes. As a condition to becoming NBPA certified, Player Agents agree to be bound by these arbitration provisions. App. 031 (Klempner Dec.), ¶ 17.

18.     Likewise, NBA players, who since 1986 have collectively determined to put in place this comprehensive system to regulate Player Agents, and who have all signed SPACs with their selected Player Agent that mandate NBPA arbitration, have agreed to be bound by these arbitration provisions. App. 031 (Klempner Dec.), ¶ 17.

19.     Arbitration plays a central role in the NBPA. It is important that only a single arbitrator at any given time be allowed to interpret the SPAC and develop a "law of the shop" governing the relationship between NBA players and Player Agents (as well as between the NBPA and Player Agents). App. 031 (Klempner Dec.), ¶ 18.

20.     The NBPA Arbitrator—presently the Hon. Richard A. Levie (Ret.), who has served as arbitrator under the NBPA Agent Regulations since 2016, having replaced the late George Nicolau, who held the post since the inception of the NBPA Agent Regulations in 1986—has vast experience in sports law and dispute resolution generally, and in resolving disputes between NBA players and their Player Agents. He is intimately familiar not only with the CBA, NBPA Agent Regulations, and relevant arbitral authority, but also with the business of Player Agents and the norms of this unique industry. App. 031-032 (Klempner Dec.), ¶ 19.

21.     Since 1986, a body of arbitral law and accepted norms have developed concerning the SPAC and the application of the NBPA Agent Regulations, and it would significantly encumber both the NBPA Arbitrator and the NBPA's ability to fulfill its mandate under federal labor law if courts, which may not be as familiar with the relevant arbitral authority and specific "law of the shop" unique to professional basketball, rendered their own interpretations of the SPAC or NBPA Agent Regulations. App. 032 (Klempner Dec.), ¶ 20.

22.    For these reasons, the scope of arbitration under Section 5 of the NBPA Agent Regulations was designed to be, and is, extremely broad. The "Introduction" to Section 5 makes this clear:

> [I]t is the intention of the NBPA that the arbitration process shall be the *exclusive method for resolving any and all disputes that may arise* from denying certification to an agent or *from the interpretation, application or enforcement of these Regulations and the resulting SPACs between Player Agents and individual Players.* This will insure that those disputes — which involve essentially internal matters concerning the relationship between individual Players, the NBPA in its capacity as their exclusive bargaining representative, and Player Agents performing certain delegated representative functions relating particularly to individual Player compensation negotiations — *will be handled and resolved expeditiously by the decision-maker established herein, without need to resort to costly and time-consuming formal adjudication*. (Emphasis added.) App. 032 (Klempner Dec.), ¶ 21.

23.    The SPAC may not be modified by an individual Player Agent or NBA player and requires that the Player Agent represent the NBA player in accordance with the NBPA Agent Regulations. All SPACs, including the SPAC between Paul and Noel, contain an arbitration provision that states:

> **7.  Arbitration: Resolution of All Disputes Arising Out of This Agreement**
>     Any and all disputes between the Player and the Agent involving the meaning, interpretation, application, or enforcement of this Agreement or the obligations of the parties under this Agreement shall be resolved exclusively through the Arbitration procedure set forth in Section 5 of the NBPA Regulations Governing Player Agents. As provided in Section 5(D) of those Regulations, if any arbitration hearing takes place, the NBPA may participate and present, by testimony or otherwise, any evidence relevant to the dispute. Because of the uniquely internal nature of any such dispute that may arise under this Agreement, the Player and the Agent agree that the arbitrator's award shall constitute a final and binding resolution of the dispute and neither party will seek judicial review on any ground.

App. 007 (SPAC), § 7; App. 032-033 (Klempner Dec.), ¶ 23.

24.    Section 5 of the NBPA Agent Regulations sets out in detail the arbitration procedures that govern disputes between NBA players and Player Agents. App. 067-071 (NBPA Agent Regulations), § 5. The NBPA Agent Regulations state that "the arbitration process shall be the exclusive method for resolving any and all disputes that may arise from…application or

enforcement of these Regulations and the resulting SPACs between Player Agents and individual Players." App. 068 (NBPA Agent Regulations), § 5; App. 032 (Klempner Dec.), ¶ 21.

25.     The NBPA arbitration procedures allow for parties to file and answer grievances, choose counsel to represent them, present evidence and testimony at a hearing before the arbitrator, and receive a written decision. App. 069-071 (NBPA Agent Regulations), § 5.

26.     Paul is a certified NBPA Player Agent, having been certified by the union in 2012. App. 033 (Klempner Dec.), ¶ 26; App. 001 (Paul Dec.), ¶ 4.

27.     On August 21, 2017, Paul and Noel entered into a SPAC in which Paul agreed to become Noel's agent. App. 002 (Paul Dec.), ¶ 14; App. 033 (Klempner Dec.), ¶ 26. The SPAC contains the arbitration provision referenced above. App. 007 (SPAC), § 7; App. 033  (Klempner Dec.), ¶ 26. KSG is not a party to the SPAC. App. 002 (Paul Dec.), ¶ 22; App. 005-008 (SPAC).

28.     After signing the SPAC with Paul, Noel executed an agreement to play with the Dallas Mavericks for the 2017/2018 season, then played for the Oklahoma City Thunder for the 2018/2019 and 2019/2020 seasons. Dkt. 1-4, Plaintiff's First Amended Petition ("Am. Petition), pp. 4-5.

29.     On or about November 25, 2020, Noel signed a Uniform Player Contract with the New York Knicks ("Knicks UPC") for $5,000,000 for one year. Dkt. 1-4 (Am. Petition), pp. 8-9.

30.     On December 19, 2020, Paul unilaterally terminated the SPAC and his Player Agent relationship with Noel. App. 002 (Paul Dec.), ¶ 14.

31.     Since Paul negotiated the Knicks UPC prior to the termination of the SPAC, the terms of the SPAC require Noel to pay Paul 4% of his earnings under the Knicks UPC (less the applicable escrow). Despite multiple written requests for payment, to date, Noel has failed to pay

Paul any amount resulting from the Knicks UPC. Therefore, on August 3, 2021, Paul initiated an NBPA arbitration against Noel as required by the SPAC. App. 003 (Paul Dec.), ¶ 26; App. 009.

32.     On August 23, 2021, Noel responded to Paul's arbitration grievance, and initiated an NBPA arbitration grievance against Paul for breach of fiduciary duty, breach of contract, negligence and gross negligence, and breach of the duty of good faith and fair dealing. App. 003 (Paul Dec.), ¶ 27; App. 010-016.

33.     The arbitration is currently pending before Hon Richard Levie (Ret.), in the matter entitled *Rich Paul v. Nerlens Noel,* JAMS Ref. No. 1410009056. App. 003 (Paul Dec.), ¶ 28; App. 017-27.

34.     Meanwhile, in breach of his agreement to exclusively arbitrate his claims pursuant to the NBPA Agent Regulations, on August 23, 2021, Noel also filed the Original Petition in this matter in state court, asserting claims against Paul identical to those asserted in the pending arbitration, asserting overlapping claims against KSG, and also seeking a declaratory judgment invalidating Section 7 of the SPAC (requiring arbitration). Dkt. 1-3 (Original Petition); App. 010-016.

35.     Noel filed his Am. Petition in state court in this lawsuit on September 3, 2021. Dkt. 1-4. The lawsuit was removed to this Court on October 11, 2021. Dkt. 1. Noel's Am. Petition also contains allegations nearly identical to his pending NBPA arbitration against Paul. Dkt. 1-4 (Am. Petition); App. 010-016.

### III.     <u>Argument and Authorities</u>

**A.     <u>*Noel's Agreement to Arbitrate is Enforceable under the Federal Arbitration Act*</u>**

Section 2 of the Federal Arbitration Act ("FAA") provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to

> perform the whole or any part thereof, or an agreement in writing to submit
> to arbitration an existing controversy arising out of a contract, transaction,
> or refusal, shall be valid, irrevocable and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of any contract. 9
> U.S.C. § 2.

Thus, the FAA mandates enforcement of arbitration agreements where such agreements: (1) are

part of a contract or transaction involving commerce; and (2) are valid under general principals of

contract law. *Id.* Indeed, the "'principal purpose' of the FAA is to 'ensur[e] that private arbitration

agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 344 (2011) (*quoting Volt Information Sciences, Inc. v. Bd. Of Trustees of Leland Standford

Junior*, 489 U.S. 468, 478 (1989)); *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20,

24, (1991) (stating that the FAA was enacted to reverse longstanding judicial hostility to arbitration

agreements and reflects Congress' declaration of a federal policy favoring arbitration); *Arciniaga

v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("it is difficult to overstate the strong

federal policy in favor of arbitration"). The arbitration agreement between Noel and Paul satisfies

both requirements of the FAA and is therefore enforceable.

    1.    The SPAC Involves Interstate Commerce

The Supreme Court has held that the FAA's reference to commerce in Section 2 reflects

Congress' intent to extend the FAA's coverage to the limits of federal power under the Commerce

Clause. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). The Court observed that

the determination of whether a transaction or contract involves commerce requires an expansive

construction of the term to effectuate Congress' goal of encouraging alternative dispute resolution

mechanisms. *Id.* Accordingly, the Court held that a matter "involves" commerce under the FAA if

it merely "affects" commerce, a standard commonly applied by the court to situations in which it

is clear that Congress intended to exercise its Commerce Clause powers to the fullest extent. *Id.*

The SPAC clearly involves and affects interstate commerce. Paul is a resident of California. App. 001 (Paul Dec.), ¶ 6. His home and office are located in Los Angeles, California. App. 001-002 (Paul Dec.), ¶¶ 3, 6, 19. Paul agreed to represent Noel in the negotiation of contracts for Noel to play for an NBA basketball team. App. 002 (Paul Dec.), ¶ 14. The NBA has 30 teams (29 in the U.S. and 1 in Canada) in 28 cities (2 each in New York City and Los Angeles) in 21 states. Noel's negotiated contracts with teams require him to perform services in the various locations in which the NBA has teams across the U.S. and Canada. During the life of the SPAC between Noel and Paul, Paul negotiated contracts for Noel for teams in Texas, Oklahoma, and New York. Dkt. 1-4 (Am. Petition), pp. 4-8.

2.   <u>The Agreement to Arbitrate is Valid Under General Contract Principles</u>

Under New York law,[2] a contract is binding if there is an offer, acceptance, consideration, mutual assent, and intent to be bound, and both sides agree on all the essential terms. *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (N.Y. App. Div. 2009). No element here can be credibly disputed. Paul offered to be Noel's agent, and Noel accepted. The SPAC is a bilateral contract in which both sides exchange promises (Paul to represent Noel; Noel to pay a fee for such representation) and which contains all of the essential terms of the relationship (including the fact that both parties agree to arbitrate all disputes between them). Paul and Noel both signed the SPAC, indicating their intent to be bound by all provisions of the SPAC, including the arbitration requirement. *See*, *generally*, App. 005-008 (SPAC). There is no question that a valid contract was formed.[3] *Kowalchuk,* 61 A.D.3d at 121-125 (holding that a contract is formed at the moment of acceptance and stating "the consideration for a bilateral contract such as this one, in which promises are exchanged, consists of the acts mutually promised"); *see also*, *Lee v. Engel Burman Grande Care*

---

[2] The SPAC states that New York law governs. App. 008 (SPAC), § 10.
[3] Noel admits that the SPAC between himself and Paul is a "valid contract." Dkt. 1-4 (Am. Petition), p. 12.

*at Jericho, LLC*, No. 20-cv-3093, 2021 WL 3725986, *3 (E.D.N.Y. Aug. 23, 2021) (holding that a written arbitration agreement must be enforced under general New York law contract formation principles).

**B.**     ***Noel's Claims Against Paul Must be Arbitrated and Are Already Pending in Arbitration***

The arbitration clause within the SPAC/NBPA Agent Regulations requires that "any and all disputes" "involving" or "aris[ing] from" the player/agent relationship to be exclusively adjudicated in NBPA arbitration. App. 007 (SPAC), § 7 (stating that the arbitration provisions exclusively govern "any and all disputes between the Player and the Agent involving…the enforcement of [the SPAC] or the obligations of the parties under [the SPAC]"); App. 068 (NBPA Agent Regulations), § 5 ("the arbitration process shall be the exclusive method for resolving any and all disputes that may arise from…application or enforcement of these Regulations and the resulting SPACs between Player Agents and individual Players," including disputes related to "Player Agents performing certain delegated representative functions relating particularly to individual Player compensation negotiations").

When parties use such all-encompassing language, courts consider the arbitration clause to be "broad" and intended to cover a wide range of claims between the parties to the arbitration agreement. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (citations omitted) ("When parties use expansive language in drafting an arbitration clause, presumably then intend all issues that 'touch matters' within the main agreement to be arbitrated."); *Convergen Energy LLC v. Brooks*, No. 20-cv-3746, 2020 WL 5549039, *16 (S.D.N.Y. Sept. 16, 2020) (holding that use of broad language such as "all disputes" "arising under or relating to" creates a presumption of arbitrability and requires arbitration of even collateral

matters that may involve contract interpretation or the parties' rights and obligations under the contract) (internal citations and quotations omitted).

Noel's claims against Paul in this lawsuit clearly stem from the SPAC, the relationship between Noel and Paul created by the SPAC, Paul's obligations to Noel under the SPAC, and the duties Paul agreed to undertake on behalf of Noel pursuant to the SPAC. More specifically, Noel brings claims against Paul for breach of fiduciary duty, breach of contract, negligence and gross negligence, breach of good faith and fair dealing, and civil conspiracy. Dkt. 1-4 (Am. Petition). Although there are several claims, they all stem from the same set of operative facts, namely that Paul contracted to be Noel's agent to represent him and negotiate contracts with NBA teams, and Noel alleges that Paul failed to do so in an adequate manner resulting in the loss of millions of dollars in contracts to which Noel believes he was entitled.  These claims all implicate whether Paul complied with the SPAC and with the standards of conduct for a Player Agent as set out in the NBPA Agent Regulations incorporated by the SPAC. App. 061-062 (NBPA Agent Regulations), §§ 3B, ¶¶ 12-14 and 3C (requiring, among other things, agents to carry out representational services with the highest degree of professional competence and integrity; advise the Player; disclose material facts to the Player; refrain from conduct involving dishonesty, fraud, misrepresentation; and refrain from conduct that jeopardizes the effective representation of Players); App. 034 (Klempner Dec.), ¶ 28.

The Player Agent relationship between Paul and Noel was created under the SPAC and the NBPA Agent Regulations. Indeed, Noel's Am. Petition directly states that the duties Paul owed to Noel were created by the SPAC. Dkt. 1-4 (Am. Petition), p. 11 ("According to Section 2 of the SPAC, Paul was expressly appointed as a fiduciary to Noel. The existence of a fiduciary relationship between Noel and Paul, with Paul owing a fiduciary duty to Noel, is an express term

of the SPAC…"). Further, the duties and responsibilities Paul owed to Noel were all set by the NBPA Agent Regulations and incorporated into the SPAC. *See*, *generally*, App. 054-062 (NBPA Agent Regulations), § 3; App. 005 (SPAC) § 1 (incorporating NBPA Agent Regulations into the SPAC). If Noel believes that Paul breached any duty owed to Noel or failed to perform any action on behalf of Noel as his agent, he necessarily believes that Paul violated the SPAC and the NBPA Agent Regulations.

As such, the broad arbitration language contained in the SPAC/ NBPA Agent Regulations encompasses this dispute and mandates that the NBPA's arbitration procedures be used to adjudicate such dispute. Indeed, it is the view of the NBPA, which represents the interests of NBA players such as Noel (and *does not* represent Player Agents such as Paul), that Noel's claims in this lawsuit are subject to mandatory and exclusive arbitration in accordance with the SPAC and NBPA Agent Regulations. App. 033-034 (Klempner Dec.), ¶ 27. Moreover, Noel's claims against Paul are already pending in NBPA arbitration before Hon. Richard Levie, through JAMS.

## C.   *Noel's Complaints Regarding KSG Must Be Arbitrated*

Noel's complaints about KSG should also be included in the arbitration proceeding even though KSG is not a signatory to the SPAC. *GE Energy Power France SAS v. Outokumpo Stainless USA, LLC,* 140 S. Ct. 1637, 1643-44 (2020) (noting that various doctrines such as assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel are all valid contractual principles that can be used by non-signatories to bind signatories to an arbitration provision). Signatories to an arbitration agreement (like Noel) are estopped from preventing arbitration of disputes with non-signatories (like KSG) when the relationship between the various parties in the litigation and the claims are intertwined with the agreement containing the arbitration clause. *Choctaw Generation Ltd. v. Amer. Home Assur.*, 271

F.3d 403, 406 (2d Cir. 2001) (holding that non-signatories can compel arbitration against a signatory under an estoppel theory when the issues that must be resolved are intertwined with the agreement the signatory has signed); *Lee*, 2021 WL 3725986, *5 (compelling arbitration of claim by signatory against non-signatory based on estoppel theory); *Convergen,* 2020 WL 5549039 at *16 (same); *see also*, *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528-29 (5th Cir. 2000) (holding that signatories are estopped from preventing arbitration of disputes with non-signatories when: (1) the signatory is relying on the terms of the agreement in asserting claims against the non-signatory; and (2) the signatory raises allegations of interdependent and concerted misconduct by the non-signatory and a signatory).

Noel's claims against KSG are essentially indistinguishable from his claims against Paul. Noel's claims against KSG[4] fall in one of two categories: (1) that KSG owed the same duties and obligations to Noel as Paul by virtue of the SPAC and Paul's relationship with KSG; or (2) that KSG conspired with or aided Paul in breaching the duties he owed to Noel under the SPAC. Dkt. 1-4 (Am. Petition). Indeed, Noel's description of the claims in the Am. Petition recognizes that Paul signed the SPAC with Noel and was officially considered to be Noel's Player Agent, but merely assumes that KSG is jointly liable for Paul's alleged conduct by virtue of the relationship between Paul and KSG. Dkt. 1-4 (Am. Petition). As such, there is no credible argument that the claims against KSG are somehow independent from the SPAC. Noel is merely alleging that Paul's supposed breaches of the SPAC also implicate KSG, This meets the estoppel test for intertwined claims. *Lee*, 2021 WL 3725986, *5 (holding that the claims were intertwined for estoppel purposes when the alleged misconduct of the non-signatory stems from the same conduct alleged against the signatory defendant); *Convergen,* 2020 WL 5549039 at *16 (noting that the test for intertwined

---

[4] Although the Am. Petition does not clearly identify which claims are brought against the specific defendants, it appears that the breach of contract claim is against only Paul.

claims was established by the fact that the party resisting arbitration treated the signatory and non-signatory defendants as one unit in drafting the complaint).

The close relationship between Paul and KSG also establishes that estoppel is appropriate here. Paul is the founder and CEO of KSG. App. 001 (Paul Dec.), ¶ 3. Paul's entering into the SPAC with Noel and performance thereunder was part of the normal course and scope of the work he performs as an agent of KSG. App. 001 (Paul Dec.) ¶ 4. Importantly, the NBPA Agent Regulations specifically state that should Paul opt to involve any agency or other person in the contractual relationship he has with Noel, conduct by such agency or person is deemed to be conduct of Paul. App. 058 (NBPA Agent Regulations), § 3A, ¶ 12. This satisfies the requirement of a close relationship between the non-signatory attempting to enforce arbitration and a signatory. *Carroll v. LeBouf, Lamb, Greene & McCrae, L.L.P.,* 374 F. Supp. 2d 375, 378-79 (S.D.N.Y. 2005) (holding that when the plaintiff's allegations stated that the signatory defendant acted as the agent of the non-signatory defendant, the plaintiff was estopped from avoiding arbitration with the non-signatory defendant).

Given the above, Noel is estopped from avoiding arbitration of his alleged claims against KSG.

**D.** _**All Claims Must Be Compelled to Arbitration and This Lawsuit Should be Dismissed**_

Section 4 of the FAA provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court … for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Act leaves no discretion to a court in determining whether to require arbitration; rather, the Act mandates that the court ***shall*** direct parties to proceed to arbitration on issues with respect to which an arbitration agreement exists. 9 U.S.C. §§ 3, 4; *Dean*

*Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (stating that valid agreements to arbitrate must be enforced); *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (holding that the FAA leaves no place for the exercise of discretion by a district court but instead mandates that the district court shall compel a matter to arbitration if covered by an arbitration agreement) (citations omitted); *Texaco Exploration and Products v. Amclyde Eng. Prod.*, 243 F.3d 906, 909 (5th Cir. 2001) (noting that if the issues are within the reach of an arbitration agreement, the district court has no discretion to deny arbitration).

An arbitration agreement exists that covers all claims in this lawsuit. As stated above, on August 3, 2021, as required by the SPAC, Paul initiated arbitration against Noel pursuant to the NBPA Agent Regulations. App. 003 (Paul Dec.), ¶ 26; App. 009. On August 23, 2021, Noel responded to Paul's NBPA arbitration grievance, initiated his own NBPA arbitration against Paul for breach of fiduciary duty, breach of contract, negligence and gross negligence, and breach of the duty of good faith and fair dealing. App. 003 (Paul Dec.), ¶ 27; App. 10-16. Arbitration has already commenced pursuant to the NBPA Agent Regulations. The arbitration is pending before Hon Richard Levie (Ret.) with JAMS. App. 003 (Paul Dec.), ¶ 28; App. 17-27. Therefore, all of Noel's claims in this lawsuit must be compelled to arbitration, and this lawsuit should be dismissed in its entirety.

**E.**   **<u>In the Alternative, this Lawsuit Must Be Dismissed Pursuant to Rule 12(b)(2)</u>**

For the reasons set forth above, this lawsuit should be compelled to arbitration and dismissed. In the alterative, this lawsuit must be dismissed in its entirety under Rule 12(b)(2) because this Court lacks personal jurisdiction over Paul and KSG.

"The plaintiff bears the burden of demonstrating facts sufficient to support both jurisdiction and venue when a nonresident defendant challenges personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2)." *Breathwit Marine Contractors, Ltd. v. Deloach Marine Services, LLC*,

994 F. Supp. 2d 845, 848 (S.D. Tex. 2014) (citations omitted). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. Rule Civ. Proc. 4(k)(1)(A)). "Because Texas's long-arm statute extends to the limits of federal constitutional due process, only [the constitutional] inquiry is required." *Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013); *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2019). Federal due process permits the exercise of personal jurisdiction over a nonresident defendant when: (1) "the non-resident purposely availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state;" and (2) "the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citation omitted).

"Minimum contacts" are shown when a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985). The nonresident defendant's availment must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *Id.* at 474 (*citing World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). This test "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 475 (internal citations and quotations omitted).

This Court must evaluate whether Defendants have had "minimum contacts" with Texas that would give rise to either "specific jurisdiction" or "general jurisdiction." *Dominion Gas Ventures, Inc. v. N.L.S., Inc.*, 889 F. Supp. 265, 267 (N.D. Tex. 1995). To establish "specific jurisdiction, Noel must show that Defendants "purposefully directed" their activities at Texas, and

this litigation results from alleged injuries that "arise out of or relate to" Defendants' activities directed at Texas. *Burger King,* 471 U.S. at 472; *Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992). To establish general jurisdiction, Noel must show that Defendants had "continuous and systematic" and "substantial" contacts with Texas. *Dominion Gas Ventures,* 889 F. Supp. at 267 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984)); *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994); *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 114 (Tex. App.--Houston [1st Dist.] 2000, no pet.). General jurisdiction requires much stronger evidence of contacts with the forum than specific jurisdiction. *Coleman*, 16 S.W.3d at 114.

1.    Paul Lacks Sufficient Contacts with Texas to Support Either General or Specific Jurisdiction[5]

There are virtually no jurisdictional allegations regarding Paul in the Am. Petition. Indeed, Noel concedes that Paul is a resident and citizen of California, and KSG is a Delaware limited liability company based in California. Dkt. 1-4 (Am. Petition), p. 1. Noel does not allege that Paul took (or failed to take) any action while in Texas.

Paul was born and raised in Cleveland, Ohio, and is a resident of the State of California. App. 001 (Paul Dec.), ¶¶ 5-6. Paul is the founder and CEO of KSG. App. 001 (Paul Dec.), ¶ 3. Paul has never lived in Texas. App. 001 (Paul Dec.), ¶ 8. Paul has never attended school in Texas, has never been employed in Texas, and has never owned or leased property in Texas. App. 002 (Paul Dec.), ¶¶ 9-11. Paul has never maintained a bank account, office, address, or phone number in Texas. App. 002 (Paul Dec.), ¶ 12. With the exception of this lawsuit, Paul has never been a party to a lawsuit filed in a federal or state court in Texas. App. 002 (Paul Dec.), ¶ 13.

---

[5] For purposes of a Rule 12(b)(2) motion, the Court may review "any combination of the recognized methods of discovery, including affidavits, interrogatories, and depositions to assist in the jurisdictional analysis." *Little v SKF Serige AB,* 2014 WL 710941, *2 (S.D. Tex Feb. 24, 2014) (internal citations omitted).

Neither Paul nor Noel executed the SPAC in Texas. App. 002 (Paul Dec.), ¶ 16. Paul did not travel to Texas to meet with Noel, representatives of the Dallas Mavericks, or otherwise, in connection with the SPAC or Paul's representation of Noel. App. 002 (Paul Dec.), ¶ 17. There are no allegations in the Am. Petition that tie any conduct by Paul in Texas to any claim asserted against Paul.

Any travel to Texas in connection with this lawsuit would be a significant inconvenience and burden to Paul and it would be unfair to subject Paul to the possibility of trial in Texas due to his absence of contacts with Texas. App. 002 (Paul Dec.), ¶ 18.

 2. <u>KSG Lacks Sufficient Contacts with Texas to Support Either General or Specific Jurisdiction</u>

There are no jurisdictional allegations relating to KSG in the Am. Petition. KSG is a Delaware limited liability company. App. 002 (Paul Dec.), ¶ 19. KSG has no members based in Texas. *Id.* KSG's principal place of business is in Los Angeles, California. *Id.*

KSG has never owned or leased property in Texas, and has never maintained a bank account, office, address, or phone number in Texas. App. 002 (Paul Dec.), ¶¶ 20-21. KSG does not itself enter into SPACs with NBA players, and KSG is not a party to the SPAC between Paul and Noel. App. 002 (Paul Dec.), ¶ 22. No KSG representative travelled to Texas to meet with representatives of the Dallas Mavericks, Noel, or otherwise, in connection with the Paul-Noel SPAC. App. 003 (Paul Dec.), ¶ 23.

KSG has one employee in Texas who works from home. App. 003 (Paul Dec.), ¶ 24. That employee is a football agent, and has no involvement with Noel or the SPAC. *Id.* The presence of one employee in Texas is not sufficient for this Court to exercise general jurisdiction over KSG. *See, e.g., BNSF Railway Co. v. Tyrrell,* 137 S.Ct. 1549, 1554 (2017) (despite BNSF having over 2000 miles of railroad track, 2100 employees, and one facility in Montana, it was not consistent

with the due process clause for Montana courts to exercise general jurisdiction over BNSF). Indeed, a "corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* at 1559 (internal citations omitted). Additionally, the presence of one employee in Texas who had no involvement with Noel or the SPAC, and no connection to this dispute, is not sufficient for this Court to exercise specific jurisdiction over KSG. *Id.* at 1559 (holding that the business BNSF does in Montana is sufficient to subject BNSF to specific personal jurisdiction in Montana relating only to the business it does in Montana); *Burger King,* 471 U.S. at 472 (to establish specific jurisdiction, the litigation must "arise out of or relate to" defendants' activities directed at Texas); *Aviles,* 978 F.2d at 204 ("[t]o exercise specific jurisdiction, defendants' contacts with the forum which are asserted as the basis for jurisdiction must be related to the subject matter of the controversy.").

Any travel to Texas in connection with this lawsuit would be a significant inconvenience and burden to KSG, and it would be unfair to subject KSG to the possibility of trial in Texas due to its absence of contacts with the State of Texas. App. 003 (Paul Dec.), ¶ 25.

## IV.   <u>Conclusion</u>

For the reasons set forth above, Defendants Richard Paul and Klutch Sports Group, LLC respectfully request that this Court dismiss this lawsuit in its entirety and compel all claims to arbitration. In the alternative, Defendants respectfully request that this Court dismiss this lawsuit in its entirety for lack of personal jurisdiction. Defendants also request all such other and further relief which this Court deems to be appropriate.

*[Signatures to Follow]*

Date: October <u>18</u>, 2021                    Respectfully Submitted,

                                               */s/ Ann Marie Arcadi*
                                               Ann Marie Arcadi (SBN 00786994)
                                               annmarie.arcadi@arcadijackson.com
                                               Seema Tendolkar (SBN 24053509)
                                               seema.tendolkar@arcadijackson.com
                                               John M. Farrell (SBN 24059735)
                                               john.farrell@arcadijackson.com
                                               ARCADI JACKSON, LLP
                                               2911 Turtle Creek Blvd., Suite 800
                                               Dallas, Texas 75219
                                               Telephone: 214-865-6458
                                               Facsimile: 214-865-6522

                                               *Attorneys for Defendants Richard Paul and*
                                               *Klutch Sports Group, LLC*

### CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October, 2020, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Craig F. Simon
State Bar No. 00784968
**LOEWINSOHN DEARY SIMON RAY
LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
Telephone: (214) 572-1700
Fax: (214) 572-1717
craigs@ldsrlaw.com

                                               */s/ Ann Marie Arcadi*
                                               Ann Marie Arcadi