# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NERLENS NOEL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-2485** |
| | § | |
| **RICHARD PAUL and KLUTCH** | § | |
| **SPORTS GROUP, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

RELEVANT BACKGROUND ........................................................................................... 2

    A.    The Parties ......................................................................................................... 2

    B.    The Conduct Giving Rise to the Claims ......................................................... 3

    C.    The SPAC ........................................................................................................... 5

    D.    Procedural Background ..................................................................................... 6

ARGUMENT ......................................................................................................................... 7

I.     THE COURT HAS AUTHORITY TO DETERMINE THAT THE
      30-DAY PROVISION IS UNENFORCEABLE ...................................................... 7

II.    THE NBPA 30-DAY STATUTE OF LIMITATIONS IS UNENFORCEABLE ........... 11

    A.    The 30-day provision violates Texas statutory law. ................................... 12

    B.    The 30-day provision violates Texas and New York common law. ...................... 13

III.   MANY OF PLAINTIFF'S CLAIMS ARE OUTSIDE THE
      SCOPE OF ARBITRATION ................................................................................. 16

    A.    Plaintiff's Declaratory Action Claim is Outside the Scope of Arbitration ............. 16

    B.    The Arbitration Provision Does Not Apply to the Claims
         Asserted Against Klutch .............................................................................. 17

    C.    If the 30-Day Provision is Determined to be Invalid, the Case Could be Bifurcated
         and Stayed Pending Conclusion of Arbitration Proceedings. ................................ 19

IV.   THERE IS PERSONAL JURISDICTION OVER DEFENDANTS IN TEXAS ............. 19

    A.    Personal Jurisdiction Standard .................................................................... 19

    B.    This Court has Specific Jurisdiction over Defendants ........................................ 21

        1.    Noel's claims arise from Defendants' contacts in Texas ........................... 22

        2.    Jurisdiction over Defendants in Texas is fair and reasonable ..................... 24

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Balta v. Ayco Co. LP.*,
  626 F. Supp. 2d 347 (W.D.N.Y. 2009) ................................................... 13

*Bellorin v. Bridgestone/Firestone, Inc.*,
  236 F. Supp. 2d 670 (W.D. Tex. 2001) ................................................. 20

*Border Steel, Inc. v. Pac. Century Customs Serv., Inc.*,
  500 F. Supp. 2d 655 (W.D. Tex. 2006) ................................................. 20

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
  345 F.3d 347 (5th Cir. 2003) .............................................................. 17

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ........................................................................... 21

*Cardoni v. Prosperity Bank*,
  805 F.3d 573 (5th Cir. 2015) .............................................................. 12

*Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*,
  374 F. Supp. 2d 375 (S.D.N.Y. 2005) ................................................. 17

*Castellanos v. Raymours Furniture Co., Inc.*,
  291 F. Supp. 3d 294 (E.D.N.Y. 2018) ................................................. 11

*Cent. Freight Lines Inc. v. APA Transp. Corp.*,
  322 F.3d 376 (5th Cir. 2003) .............................................................. 22

*Coleman & Co. Sec. v. Giaquinto Fam. Tr.*,
  No. 00 CIV. 1632 (DC), 2000 WL 1683450 (S.D.N.Y. Nov. 9, 2000) ................... 8

*David Tunick, Inc. v. Kornfeld*,
  813 F. Supp. 988 (S.D.N.Y. 1993) ...................................................... 14

*Denney v. Jenkens & Gilchrist*,
  412 F. Supp. 2d 293 (S.D.N.Y. 2005) ................................................. 18

*Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*,
  414 F. Supp. 3d 960 (W.D. Tex. 2019) ............................................... 21

*Felch v. Transportes Lar–Mex SA De CV*,
  92 F.3d 320 (5th Cir. 1996) ............................................................... 24

*First Options of First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ............................................................................. 9

*Fitzpatrick & Weller, Inc. v. Miller*,
  309 A.D.2d 1273, 765 N.Y.S.2d 555, 556 (2003) ............................... 14

*G.T. Leach Builders, LLC v. Sapphire V.P., LP*,
　458 S.W.3d 502 (Tex. 2015)...................................................................................... 9, 11

*Gandee v. LDL Freedom Enterp., Inc.*,
　293 P.3d 1197 (Wash. 2013) .......................................................................................... 14

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*,
　921 F.3d 522 (5th Cir. 2019) ......................................................................................... 16

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
　230 F.3d 549 (2d Cir. 2000) ........................................................................................... 12

*Hill v. Garda CL Nw., Inc.*,
　308 P.3d 635 (Wash. 2013) .......................................................................................... 14

*Howsam v. Dean Witter Reynolds, Inc.*,
　537 U.S. 79 (2002)............................................................................................................ 7

*IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*,
　387 S.W.3d 799 (Tex. App.—El Paso 2012, no pet.)...................................................... 8

*J.M. Huber Corp. v. Pan Am. Express, Inc.*,
　118 F. Supp. 2d 764 (S.D. Tex. 2000) ............................................................................ 21

*Jody James Farms, JV v. Altman Grp., Inc.*,
　547 S.W.3d 624 (Tex. 2018)......................................................................................... 8, 9

*Johnston v. Multidata Sys. Int'l Corp.*,
　523 F.3d 602 (5th Cir. 2008) ......................................................................................... 20

*Kent Waterfront Assocs., LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
　104 N.Y.S.3d 715 (N.Y. App. Div. 2019) ...................................................................... 10

*Loc. Union No. 898 Of Int'l Bhd. of Elec. Workers, AFL-CIO v. XL Elec., Inc.*,
　380 F.3d 868 (5th Cir. 2004) ........................................................................................... 8

*Lucchese Boot Co. v. Rodriguez*,
　473 S.W.3d 373 (Tex. App.—El Paso 2015, no pet.)............................................. 8, 9, 10, 11

*Markowits v. Friedman*,
　42 N.Y.S.3d 218 (N.Y. App. Div. 2016) ....................................................................... 10

*Mazurkiewicz v. Clayton Homes, Inc.*,
　971 F. Supp. 2d 682 (S.D. Tex. 2013) ............................................................................ 13

*Micheletti v. Uber Techs., Inc.*,
　213 F. Supp. 3d 839 (W.D. Tex. 2016) ......................................................................... 8, 9

*Potiyeviskiy, v. TM Transp., Inc.*,
　No. 1-13-1864, 2013 IL App (1st) 131864-U (Ill. Ct. App. Nov. 25, 2013)........................... 14

*Puleo v. Chase Bank USA, N.A.*,
　605 F.3d 172 (3d Cir. 2010) ............................................................................................ 8

*R.P. Small Corp. v. Land Dep't, Inc.,*
   505 F. Supp. 3d 681 (S.D. Tex. 2020) ............................................................. 17

*Ruston Gas Turbines, Inc. v. Donaldson Co.,*
   9 F.3d 415 (5th Cir. 1993) ................................................................................ 20

*Salisbury v. Art Van Furniture,*
   938 F. Supp. 435 (W.D. Mich. 1996) .............................................................. 13

*Samaniego v. Empire Today LLC,*
   140 Cal. Rptr. 3d 492 (2012) ........................................................................... 14

*Sandvik AB v. Advent Int'l Corp.,*
   220 F.3d 99 (3d Cir. 2000) ................................................................................. 8

*Spataro v. Hirschhorn,*
   40 A.D.3d 1070, 837 N.Y.S.2d 258 (2007) .................................................... 14

*Stripling v. Jordan Prod. Co., LLC,*
   234 F.3d 863 (5th Cir. 2000) ........................................................................... 20

*Southwest Rsch. Inst. v. California Fueling, LLC,*
   509 F. Supp. 3d 656 (W.D. Tex. 2020) ........................................................... 20

*Sydow v. Acheson & Co.,*
   81 F. Supp. 2d 758 (S.D. Tex. 2000) .............................................................. 22

*USA United Holdings, Inc. v. Tse-Peo, Inc.,*
   23 Misc. 3d 1114(A), 886 N.Y.S.2d 69 (Sup. Ct. 2009) ......................... 13, 14

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,*
   489 U.S. 468 (1989) .......................................................................................... 16

*Westmoreland v. Sadoux,*
   299 F.3d 462 (5th Cir. 2002) ........................................................................... 17

*WN Partner, LLC v. Baltimore Orioles Ltd. P'ship,*
   112 N.Y.S.3d 68 (N.Y. App. Div. 2019) ................................................... 10, 11

STATUTES

Tex. Civ. Prac. & Rem. Code § 16.070 ............................................................... 12
Tex. Code. Ann. §§ 16.004(5) and 16.051 ........................................................... 13

OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws, § 187(2) ........................................... 12

Plaintiff Nerlens Noel ("Noel" or "Plaintiff") submits this Brief in opposition to Defendants Richard "Rich" Paul ("Paul") and Klutch Sports Group, LLC's ("Klutch") (collectively "Defendants") Motion to Dismiss under Rule 12(b)(3) and to Compel Arbitration pursuant to 9 U.S.C. § 3; or in the alternative, their Motion to Dismiss under Rule 12(b)(2) for Lack of Personal Jurisdiction [Dkt. 3] ("the Motion"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

Defendants seek to dismiss Plaintiff's claims and compel arbitration. Defendants' position that every claim asserted by Plaintiff is subject to arbitration is incorrect. Defendant Klutch is not a party to any agreement with Plaintiff, let alone one containing an arbitration provision. Moreover, before arbitration can be compelled on any claims, there is a threshold issue of arbitrability for this Court to decide. This threshold issue involves the question of whether or not a 30-day statute of limitations provision set forth in the National Basketball Players Association ("NBPA") arbitration rules is valid and enforceable as against Plaintiff in this case. It is not. Indeed, the unreasonable and unenforceable provision should be severed from the contract at issue. The 30-day statute of limitations violates Tex. Civil Practice & Remedies Code, § 16.070, which makes clear that parties cannot contract away statute of limitations periods if the limitation period is shortened to less than two years. The 30-day provision also violates the common law of Texas (and/or New York) in that it unreasonable. The provision, if applied, could effectively deprive Plaintiff of the ability to pursue his claims.

Defendants also seek to dismiss for lack of personal jurisdiction. However, there is specific jurisdiction over both Defendants in Texas. Much of the conduct giving rise to the claims arises from a business relationship that, when formed, involved a Texas citizen performing services in Texas while working for a Texas organization. Defendants regularly engaged in or otherwise directed communications to Plaintiff in Texas – knowing he was performing services in and

1

residing in Texas.  And, Defendants earned significant revenue from Defendants' services in Texas.  Through their relationship with Plaintiff (and likely other clients), Defendants have purposefully availed themselves of the benefits of Texas law and could reasonably foresee the possibility that they might get sued here because of that relationship.  Moreover, Plaintiff believes that jurisdictional discovery would reveal that Defendants have multiple clients who are either residents in and/or provide services in Texas and that Defendants earn substantial revenue from activities in Texas.  As set forth in Plaintiff's motion for jurisdictional discovery filed contemporaneously herewith, Plaintiff is at a minimum entitled to jurisdictional discovery before the Court addresses the Rule 12(b)(2) motion.  This case should not be dismissed.

## RELEVANT BACKGROUND

### A.     The Parties

Plaintiff is a professional basketball player who currently plays in the National Basketball Association ("NBA").  *See* Declaration of Nerlens Noel ("Noel Dec."), App. 1, ¶ 3; *see also* Amended Petition ("Am. Pet."), § III(A), p. 2, (Dkt. 1-4).  While Plaintiff began his career with the Philadelphia 76ers, he was traded to the Dallas, Mavericks on February 23, 2017 and made his debut for the team a few days later.  Am. Pet., p. 3.  Noel finished the 2016/2017 for the Mavericks, playing in 22 games total before the end of the season. *Id.*  Following the trade to Dallas, Plaintiff leased a home in Texas and resided in the Dallas/Ft. Worth area.  Noel Dec., App. 1, ¶ 6.

Plaintiff became a restricted free agent when his first season with the Mavs was completed. Am. Pet., p. 3.  Prior to the start of the following season (the 2017/2018 NBA season), Plaintiff received an offer (through his prior agent) to continue playing in Dallas under a contract with the Mavericks worth approximately $70 million over four years.[1]  *Id.*

---

[1] Plaintiff's former agent would have received a payment based on a percentage of the overall deal had Mr. Noel's accepted this contract at the time.  *Id.*, pp. 4-5.

It was around this time that Plaintiff met with Defendant Paul (initially in California).  Paul is a sports agent specializing in representing NBA players.  Am. Pet., p. 3; *see also* Motion, p. 3. Paul is the founder, CEO, and Board Member of Defendant Klutch Sports, the sports agency organization founded by Paul.  *Id.*  Paul and Klutch Sports serve clients all over the country.  Am. Pet., pp. 3-4.  Paul and Klutch had more than $1.3 billion in contracts under management in 2020. *Id.*

**B.     The Conduct Giving Rise to the Claims**

Paul advised Plaintiff in one of their initial meetings in and around July of 2017, that if Plaintiff terminated his relationship with his prior agent, he would get Plaintiff a "max deal" with the Mavericks or some other team.  Am. Pet., p. 4.  Despite the existence of a prior $70 million, multi-year offer, Paul advised Plaintiff to cease any further negotiations with the Mavericks, accept a qualifying offer from the team, and then they would work to secure a "max deal" on the free agent market the following season.  *Id.*

In reliance on Paul's advice, Plaintiff terminated his relationship with his prior agent and formally entered into a contract with Paul on August 21, 2017.  *See* Standard Player Agent Contract ("SPAC"), Dkt. 4, Ex. A-1, App. 005-008.  The SPAC was executed by both Plaintiff and Paul in their individual capacities.  *Id.*  At the time he executed the SPAC, Plaintiff resided in Texas.  Noel Dec., App. 2, ¶ 13; *see also* SPAC, § 8.

In further reliance on Paul's advice, Plaintiff accepted and entered the qualifying offer with the Mavericks on August 23, 2017 for a one-year contract.  Am. Pet., p. 4.  That agreement was titled National Basketball Association Uniform Player Contract (the "Dallas UPC"), *see* Dallas UPC, App. 6-29.  The Dallas UPC called for Noel to be paid $4,187,599 for his services in Dallas for the Mavericks.  *Id.*, *see also* Am. Pet., p. 5.  As Plaintiff's agent, Paul received 4% of the value of the Dallas UPC, or roughly $167,000.  *Id*; *see also* Dallas UPC, App. 6-29.

The 2017/2018 season began and Plaintiff was performing services in Texas and residing there. During that time, he engaged in regular communications (texts and telephone calls) with Paul and other representatives of Klutch in connection with their obligations under the SPAC and Plaintiff's services with the Mavericks.  Noel Dec. App. 3, ¶ 18.  These discussions revolved around Plaintiff's performance as a player as well as plans to try and secure Plaintiff a "max deal" following the season.  *Id*.  Unfortunately, however, by December 2017, Plaintiff suffered an injury and was forced to miss 42 games of the season.  Am. Pet., p. 6.  Plaintiff continued to work out and rehabilitate despite his injury and maintained a continuous course of communication with Paul and Klutch during this time.  Noel Dec., App. 3, ¶ 19.  Discussions between Plaintiff and Paul, at that time, primarily revolved around Plaintiff's rehabilitation efforts and securing a contract for Plaintiff for the next season.  *Id*.

Throughout this time, Paul was obligated to continue to act as a fiduciary on Plaintiff's behalf with respect to his rights under his existing contract with the Mavericks, as well as compensation negotiations with the Mavericks and other NBA clubs.  Because Plaintiff was playing under a 1-year contract with the Mavericks, after which he would become a free agent, Paul's services during and immediately after the 2017/2018 season were particularly important for Plaintiff's career and future compensation.  Nevertheless, following the season and into the critical offseason, Defendants did not present Noel any potential long-term deals or other significant contracts.  The lack of such offers ultimately led Noel to sign a league minimum deal with the Oklahoma City Thunder on July 6, 2018.  Am. Pet., p. 6.  Paul and Klutch continued to fail Plaintiff for the next several seasons and years, resulting in Noel's signing a series of league minimum deals, while comparable players in the league were signing lucrative long-term contracts.  Am. Pet., p. 9.  Plaintiff and Paul eventually parted ways in December, 2020.  *Id*.  In August of 2021,

after he was unburdened with Defendants' inadequate representation, Plaintiff was able to secure his true market value with a three-year, $32 million contract with the New York Knicks.  Plaintiff still plays for the Knicks today.  *Id*.

**C.**     **The SPAC**

Under the SPAC, Paul agreed to represent Plaintiff in conducting individual compensation negotiations for the performance of Plaintiff's services as a professional basketball player with a particular NBA club (the Dallas Mavericks at the time of execution).  *See* SPAC, § 2.  Section 7 of the SPAC states that any and all disputes between Plaintiff and Paul involving the meaning, interpretation, application, or enforcement of the SPAC will be resolved through the arbitration process laid out in the NBPA Regulations Governing Player Agents ("NBPA Regulations").  *See* Dkt. 4, Ex. B-1, App. 36-79.[2]  According to § 5 of the NBPA Regulations, the NBA's arbitration process is to be the exclusive method for resolving disputes that could arise from denying certification to a Player-Agent applicant, or from the interpretation, application, or enforcement of the Regulations and resulting SPACs.  *See* NBPA Regulations, § 5, Ex. 3.  The section then goes on to enumerate the "three types of disputes" to which the arbitration procedures apply:

(1)  The NBPA denies an Application and the applicant wishes to appeal from that action;

(2)  A dispute arises with respect to the meaning, interpretation, or enforcement of a SPAC ….; and

(3)  A dispute arises between two or more Player Agents with respect to their individual entitlement to fees owed, whether paid or unpaid, by a Player who was jointly represented by such Player Agents….

*Id*.

---

[2] For purposes of clarity, and as will be discussed below, the SPAC itself contains no provisions related to the arbitration; it only incorporates by reference the arbitration provisions of the NBPA Regulations.

Of critical importance to this case and the present motion, § 5A of the SPAC provides that arbitration proceedings required under the SPAC must be brought "within thirty (30) days from the date of the occurrence of the event upon which the grievance is based or within thirty (30) days from the date on which the facts of the matter become known or reasonably should have become known to the grievant …." ("the 30-Day Provision"), Dkt. 4, Ex. A-1.  The section concerning arbitration, is the only section of the NBPA Regulations expressly incorporated by the SPAC.

## D.    Procedural Background

Plaintiff filed suit in Texas state court on August 23, 2021 and later amended his petition on September 3, 2021.  Defendants removed the case to this Court on October 11, 2021.  (Dkt. 1). Plaintiff asserts seven separate claims against Defendants: (1) an action for declaratory judgment seeking a ruling that 30-Day Provision is invalid, void and unenforceable (Count I); (2) breach of fiduciary duty against Paul (Count II); (3) breach of contract against Paul (Count III); (4) negligence and gross negligence against Paul and Klutch (Count IV); (5) breach of the duty of good faith and fair dealing against Paul and Klutch Sports (Count V); (6) civil conspiracy against Paul and Klutch (Count VI); and (7) aiding and abetting breach of fiduciary duty against Klutch (Count VII).  *See* generally, Am. Pet., pp. 2-23.[3]  Among other things, Plaintiff's claims are premised on Paul's inducing Plaintiff to terminate his relationship with his prior agent, Paul's negligent and reckless advice in having Plaintiff cease negotiations with the Dallas Mavericks, and Paul's subsequent flagrant disregard of his contractual and common law duties thereafter to act in Noel's best interests.

---

[3] Hours after Plaintiff filed his Amended Petition in Texas, Plaintiff likewise filed an arbitration response and counterclaim to Paul's initiation of arbitration proceedings under the NBPA Regulations.  *See* Dkt 4, Ex. A-3, App. 10-16.

Relying on an improperly narrow and restrictive view of Plaintiff's claims, Defendants contend that each and every claim made by Plaintiff against both Defendants is subject to arbitration.  But Plaintiffs' claims go well beyond the SPAC.  His claims do not merely concern Paul's claim to a portion of a 2020 contract executed during the course of his relationship with Plaintiff, nor does it just concern Paul's work to secure that contract.  Rather, this case involves actions, omissions, and representations made by Defendants for a period of three-plus years, including actions taken prior to the execution of the SPAC.  Plaintiff's complaint alleges an ongoing and lengthy pattern of inadequate representation marked by, at best, negligent behavior, much of which occurred behind the scenes and in a manner not readily detectable by a player in Plaintiff's position, and all at the cost of several million dollars extending over multiple contracts. Plaintiff's full legal arguments are set forth below.

## ARGUMENT

## I.   THE COURT HAS AUTHORITY TO DETERMINE THAT THE 30-DAY PROVISION IS UNENFORCEABLE

This Court has the authority to determine the arbitrability of Plaintiff's claims, including whether the parties entered into a valid agreement to arbitrate, whether such an agreement is enforceable and, if so, whether Plaintiff's claims fall within the scope of said agreement.  Questions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  Courts have held that arbitrators "are neither well-suited, nor generally permitted, to assess" the existence and scope of his or her own jurisdiction; their authority is limited to the merits of the underlying dispute as well as related procedural issues.  *See e.g., Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 182–83 (3d Cir. 2010) (citing *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 111 (3d Cir. 2000)) ("[A]llow[ing] the arbitrators to determine their own jurisdiction is not

permitted in the federal jurisprudence of arbitration, for the question whether a dispute is to be arbitrated belongs to the courts unless the parties agree otherwise."); *see also Coleman & Co. Sec. v. Giaquinto Fam. Tr.*, No. 00 CIV. 1632 (DC), 2000 WL 1683450, at *2 (S.D.N.Y. Nov. 9, 2000) (threshold statute of limitations questions are for the courts, not the arbitrators); *Loc. Union No. 898 Of Int'l Bhd. of Elec. Workers, AFL-CIO v. XL Elec., Inc.*, 380 F.3d 868, 870 (5th Cir. 2004) ("…. the question of arbitrability is a question for the court.").

Texas courts have repeatedly held that "[w]hether parties have agreed to arbitrate is a gateway matter ordinarily committed to the trial court and controlled by state law governing 'the validity, revocability, and enforceability of contracts generally.'" *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018) ("[C]ompelled arbitration cannot precede a judicial determination that an agreement to arbitrate exists."); *Lucchese Boot Co. v. Rodriguez*, 473 S.W.3d 373, 381 (Tex. App.—El Paso 2015, no pet.) ("Ordinarily, the trial court retains the power to rule on so-called 'gateway' issues such as whether an arbitration agreement exists or is enforceable."); *IHS Acquisition No. 171, Inc. v. Beatty-Ortiz*, 387 S.W.3d 799, 807 (Tex. App.—El Paso 2012, no pet.) ("When a dispute involving an agreement to arbitrate is brought to a court for resolution, it is the court's obligation to determine whether the parties agreed to submit a particular issue to arbitration.").[4]  According to the Texas Supreme Court, the courts' role is first to decide whether

---

[4] The SPAC contains a choice of law provision indicating that the agreement "shall be construed, interpreted and enforced according to the laws of the State of New York." (§ 10 of the SPAC). However, the SPAC's New York choice of law provision does not apply to the question of arbitrability. *See Micheletti v. Uber Techs., Inc.*, 213 F. Supp. 3d 839, 846 (W.D. Tex. 2016). In *Micheletti*, for example, the agreement at issue contained both an arbitration provision, as well as a provision delegating to the arbitrator the authority to determine threshold issues of arbitrability. The agreement also contained a general choice of law provision in favor of California, but it was not provided within the specific arbitration provision at issue and therefore not within the antecedent delegation provision. Thus, the Western District held that the choice of law provision had no effect on the court's determination of the enforceability of the provision. *Id.* at 847. This case involves a similar situation, where the choice of law provision is separate from the arbitration

8

the parties made a valid and presently enforceable agreement to arbitrate and, if they did, then decide whether the present disputes fall within the scope of that agreement. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 519 (Tex. 2015). A presumption favors adjudication of arbitrability by the courts absent **clear and unmistakable evidence** of the parties' intent to submit that matter to arbitration. *Jody James Farms*, 547 S.W.3d at 631*; see also First Options of First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (courts "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so"). This unmistakable clarity standard follows "the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration" and protects unwilling parties from compelled arbitration of matters they reasonably expected a judge, not an arbitrator, would decide. *Id.* (holding that an arbitration agreement's mere incorporation of the AAA rules does not necessarily show a clear intent to arbitrate arbitrability).

While courts acknowledge that parties to an agreement can agree to delegate gateway decisions on arbitrability to an arbitrator rather than a court, such delegation must, again, be clear and unmistakable. *Lucchese*, 473 S.W.3d 373 is illustrative. There, the employer argued that an incorporation by reference in a Problem Resolution Program of employment arbitration rules – which allowed an arbitrator to rule on the issue of his own jurisdiction – definitively established the parties' intent to submit even gateway issues to arbitration. While acknowledging that some Texas courts had found that a broadly worded arbitration clause, when coupled with incorporation by reference of such rules, could demonstrate the parties' intent to submit even gateway issues of arbitrability to an arbitrator, the court made clear that the "majority view does not mandate that

---

provision and the more detailed procedures laid out in the NBPA Regulations. Further still, the arbitration provision is silent on questions of arbitrability.

arbitrators decide arbitrability in all cases where an arbitration clause incorporates" an arbitration organization's procedural rules by reference. *Id.* at 382.  The court distinguished between provisions that contain specific language addressing gateway issues of arbitrability or otherwise purporting to apply to all disputes, as opposed to agreements purporting to apply to only "Covered Disputes" or other indications of an intent to place substantive constraints on the arbitrator's power.  Because the agreement in *Lucchese* restricted the arbitrator's power to hear only certain classes of disputes, the court said that, even though the arbitration rules incorporated into the agreement provided for arbitration of the gateway issue, the court would "not read an unwritten clause into the agreement that enlarges the arbitrator's ability to rule on … gateway issue disputes based on silence or **mere incorporation by reference of general arbitration rules**." *Id.* (emphasis added).

New York law also holds that questions of arbitrability are for the courts.  *Markowits v. Friedman*, 42 N.Y.S.3d 218, 222 (N.Y. App. Div. 2016); *Kent Waterfront Assocs., LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 104 N.Y.S.3d 715 (N.Y. App. Div. 2019).  The threshold determination must be made by the court unless the parties have "evinced a clear and unmistakable agreement to arbitrate arbitrability."  *Id.*

Here, the SPAC provides that certain disputes—those between the Player and the Agent involving the meaning, interpretation, application, or enforcement of the SPAC, or the obligations of the parties under the SPAC—shall be resolved through the arbitration process laid out in the NBPA Regulations. Importantly, neither the NBPA Regulations nor the SPAC contain any language, much less language that is clear or unmistakable, that the parties agreed to delegate gateway questions of arbitrability to the arbitrator. There is no mention of an arbitrator's jurisdiction or otherwise of his/her authority to decide "threshold" matters, or matters pertaining

to the scope or enforceability of arbitration itself.  In fact, § 5 of the NBPA Regulations specifically enumerates the "three types of disputes" that may arise to which its arbitration procedures apply (*see* discussion, pp. 11-12, *supra*).  The identification of three specific types of disputes subject to arbitration in itself expresses an intent to limit the arbitrator's authority.  *See, e.g., Lucchese,* 473 S.W.3d at 382-83.

Because there is no "clear and unmistakable" evidence from which Defendants can overcome the presumption that threshold issues of arbitrability should be decided by the Court, this Court has the full authority to rule on the question of whether the 30-day statute of limitations is enforceable as against Plaintiff in this case as a matter of arbitrability.  Courts have made similar determinations related to the issue of whether a contractually provided statute of limitations period is a question of arbitrability. *See e.g. Coleman*, 2000 WL 1683450, at *2; and *see G.T. Leach Builders, LLC*, 458 S.W.3d at 522 ("If a party contends, for example, that a contractual deadline renders the agreement to arbitrate unconscionable or that the deadline operates to limit the scope of the claims the parties agreed to arbitrate, those contentions might raise issues of substantive arbitrability for the courts to decide."); and *Castellanos v. Raymours Furniture Co., Inc*., 291 F. Supp. 3d 294, 298 (E.D.N.Y. 2018) (holding that issue of whether limitations period was enforceable "falls squarely within the Court's province.").

As set forth below, it is unenforceable as violating Texas law and/or as being unreasonable.

## II.     THE NBPA 30-DAY STATUTE OF LIMITATIONS IS UNENFORCEABLE

While not addressed in their Motion to Dismiss, Plaintiff understands that Defendants intend to argue that Plaintiff's claims are barred by the NBPA 30-Day Provision because the claims were not brought within the 30 days of either the occurrence of the complained-of actions or within 30 days of when Plaintiff should have known of the facts giving rise to the claims.  *See* Am. Pet., p. 10.  Plaintiff asks this Court to consider the 30-Day Provision and hold that it is unenforceable

as against Plaintiff.  The 30-Day Provision is unenforceable under either Texas or New York law, since it violates Tex. Civil Practice & Remedies Code, § 16.070 and/or is otherwise unreasonable.[5] Enforcing the 30-Day Provision in this case against Plaintiff could effectively bar him from asserting his claims.  This would bring about an overly unreasonable and harsh result for Plaintiff considering the magnitude of his claims and the egregiousness of the conduct of Defendants.

### A.    The 30-day provision violates Texas statutory law.

Section 16.070(a) of Texas' Civil Practices and Remedies Code states that "a person may not enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to **a period shorter than two years**.  A stipulation, contract, or agreement that establishes a limitations period that **is shorter than two years is void in this state**."  *See* Tex. Civ. Prac. & Rem. Code § 16.070 (emphasis added).  Accordingly, applying Texas law here would serve to void the 30-Day Provision outright.  For example, Plaintiff asserts claims for breach of fiduciary duty and breach of contract.  In Texas, claims for breach of contract and breach of fiduciary duty are subject to four-year statutory limitations periods.  Tex. Code. Ann.

---

[5] The general rule in Texas and New York, like most other states, is that absent fraud or a violation of public policy, a court will apply the law selected in a contract **as long as the state selected has sufficient contacts with the transaction**.  *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580-81 (5th Cir. 2015); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd*., 230 F.3d 549, 556 (2d Cir. 2000).  In other words, a choice of law clause can be invalidated if there is no reasonable basis for the parties' choice of forum or the chosen forum state has no substantial relationship to the parties or the transaction at issue.  If the state identified in the contract has no relationship to the parties or the transaction, and there was no reasonable basis to choose that state, then another state law should be applied – or a state with the most significant contacts with the matter in dispute. Restatement (Second) of Conflict of Laws, § 187(2). At the time Plaintiff entered into the SPAC he was residing and working in Texas. According to the SPAC, Paul was located in Ohio. Klutch Sports, Paul's agency, is and was headquartered in California. From execution of the SPAC until the summer of 2018, Noel performed services in Texas. In August of 2018, Noel signed a player contract to provide services in Oklahoma. Those services continued until the summer of 2020. From August of 2017 through roughly August of 2020, New York had absolutely no relationship to the services performed under the SPAC (aside from Plaintiff playing a handful of games there during the season). The only relationship New York had at that time was that it is the headquarters of the NBA and the NBPA.

§§ 16.004(5) and 16.051.  In New York, these claims carry with them similarly long limitations periods with breach of contract having a six-year period, and breach of fiduciary duty three.  *See Balta v. Ayco Co. LP.*, 626 F. Supp. 2d 347, 357 (W.D.N.Y. 2009).  The NBPA Regulations shorten these lengthy, multi-year limitations periods to the unreasonable time-frame of a mere 30 days.  This is well below the two-year threshold set forth under Texas law.

### B.    The 30-day provision violates Texas and New York common law.

Even if the Texas statute did not apply, both Texas and New York recognize that a provision in a contract may validly limit the time for bringing an action on such a contract to a period less than that prescribed in the general statute of limitations, **but only if the shortened period prescribed by contract is reasonable**.  *See e.g.*, *Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d 682, 686 (S.D. Tex. 2013); *USA United Holdings, Inc. v. Tse-Peo, Inc.*, 23 Misc. 3d 1114(A), 886 N.Y.S.2d 69 (Sup. Ct. 2009) ("[w]here a shorter period of time than the statutory period is fixed by contract, the contractual period, in any event, must be reasonable and it may be examined to determine if it is unreasonably short.").    Such provisions are categorically unreasonable if they effectively limit a plaintiff's substantive right to recovery or act as a complete bar to relief.  *Id*. (citing *Salisbury v. Art Van Furniture*, 938 F. Supp. 435, 437–38 (W.D. Mich. 1996) ("[T]he contractual limitation certainly effected a 'practical abrogation' of the right to file an ADA claim and is, therefore, unreasonable....").

In *Mazurkiewicz*, for example, the Southern District of Texas held that a six-month limitations period in an employment contract in which to bring employment-related claims was unenforceable because it effectively barred the plaintiff's ADA claims, and otherwise substantially limited an FLSA plaintiff's damages.  *Id*. at 689-690.  Similarly, in *USA United Holdings*, a New York court held that "[w]here a shorter period of time than the statutory period is fixed by contract, the contractual period, in any event, must be reasonable and it may be examined to determine if it

is unreasonably short." *USA United*, 886 N.Y.S.2d at *7.  In making the determination of whether the contractual period of time is unreasonable, consideration must be given to all provisions of the contract, the circumstances of its performance, and the relative abilities and bargaining positions of the parties. *Id*., citing *Fitzpatrick & Weller, Inc. v. Miller*, 309 A.D.2d 1273, 765 N.Y.S.2d 555, 556 (2003) (finding a time period of 14 days within which to commence legal action would be "unreasonably short" and thus unenforceable); *David Tunick, Inc. v. Kornfeld*, 813 F. Supp. 988, 993 (S.D.N.Y. 1993) (collecting cases) (holding that, "[a]s a matter of public policy, contractual provisions that purport to shorten otherwise applicable limitations periods will be enforced only if reasonable."); *see also Spataro v. Hirschhorn*, 40 A.D.3d 1070, 1071, 837 N.Y.S.2d 258, 259 (2007) (finding that an arbitration clause requiring that demand be made in writing within twenty (20) days after dispute had arisen was unenforceable because the period was "unreasonably short").

These authorities are squarely in line with decisions from courts around the country finding that limitations periods contracted down to as low as 30 days are unreasonable. *See e.g., Hill v. Garda CL Nw., Inc*., 308 P.3d 635 (Wash. 2013) (holding that significantly shortened statutes of limitation in arbitration provision were unconscionable); *Gandee v. LDL Freedom Enterp., Inc.*, 293 P.3d 1197, 1201 (Wash. 2013) (striking down provision reducing statute of limitations from several years to thirty days); *Potiyeviskiy, v. TM Transp., Inc*., No. 1-13-1864, 2013 IL App (1st) 131864-U, at *7-8 (Ill. Ct. App. Nov. 25, 2013) (holding arbitration provision's ten-day statute of limitations unreasonable as applied to the facts of the case and unenforceable as a matter of generally applicable state law); *Samaniego v. Empire Today LLC*, 140 Cal. Rptr. 3d 492, 499 (2012) (holding an arbitration provision limiting the statute of limitations to six months was

14

unconscionable when considered in conjunction with other unfair provisions in the arbitration clause).

In this case, the conduct complained of giving rise to Plaintiff's claims stretches from the summer of 2017 up to and through August of 2021. Notwithstanding this timeline, if the 30-Day Provision is applied, Plaintiff would have been barred from any relief unless he discovered Defendants' wrongful conduct and the extent of his injuries and brought a claim for relief in a matter of days. Given the scope and impact of Defendants' misconduct, it is unreasonable to expect Plaintiff to have discovered, investigated, obtained proof of, or otherwise been in a position to meaningfully arbitrate the full extent of his injuries resulting from Defendants' conduct within that 30-day window. Nor would it be reasonable for him to even realize the nature of all of the wrongs that were perpetrated against him in that time. As an example, it was not until August of 2021 that Plaintiff was able to fully realize his market potential, and thus Paul's monumental failures as an agent, after finally being able to obtain a contract through effective representation.

Further supporting a finding of unreasonableness, the 30-Day Provision does not apply equally to Plaintiff and Defendant. The potential claims of Defendants contemplated by the SPAC and NBPA Regulations wholly center around alleged entitlement to fees owed from player contracts. Unlike the claims in this case, which involve relatively complex issues of standards of care and acts/omissions over the course of a number of years, Defendants' collection-based claim is far more discrete and tied to a specific date (when Plaintiff signed a contract triggering an obligation to pay a percentage). Application of the 30-Day Provision might be reasonable for such claims. But subjecting Plaintiff to the same timeframe in which to bring complex civil claims is, at best, inequitable. The 30-day Provision is unreasonable and unenforceable when considered in the context of the facts of this case.

III.    **MANY OF PLAINTIFF'S CLAIMS ARE OUTSIDE THE SCOPE OF ARBITRATION**

By seeking complete dismissal of the case under Fed. Rule 12(b)(3), Defendants seek to compel all of the claims asserted by Noel to arbitration.  However, even if the Court were to determine that one or more of the claims at issue here are subject to the arbitration proceedings, many of Noel's claims are outside any reasonably interpreted scope of the arbitration provision. There is no basis to dismiss the case in its entirety.

A.    **Plaintiff's Declaratory Action Claim is Outside the Scope of Arbitration**

The Federal Arbitration Act ("FAA") "does not require parties to arbitrate when they have not agreed to do so . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement."  *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal citations omitted).  If a court determines that a dispute between the parties falls outside the scope of the arbitration agreement, the court must deny a motion to compel arbitration.  *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 532 (5th Cir. 2019).  As discussed above, the NBPA Regulations limit the scope of its arbitration provision to "three types of disputes."  *See* NBPA Regulations, § 5, Dkt 4, Ex. B-1, App. 36-79.  Here, the only category of claim even potentially subject to the NBPA arbitration provision would be a dispute between Noel and Paul arising from the meaning, interpretation, or enforcement of the SPAC.  But Plaintiff asserts multiple claims that do not fall into that category, including his claim for seeking a declaration that the 30-day statute of limitations in the NBPA Regulations, as incorporated in the SPAC, is invalid, void, and unenforceable as applied to Plaintiff's claims.  *See* Am. Pet., p. 10.  As discussed above, challenges to the validity and enforceability of an arbitration provision are outside the scope of the arbitration proceedings.

16

Likewise, Plaintiff's claims for breach of fiduciary duty, negligence, and breach of the duties of good faith and fair dealing fall outside the scope of the arbitration provision. The aforementioned claims, while involving a Player and Player Agent, are premised on facts outside of the limited ambit of the "meaning, interpretation, or enforcement" of the SPAC and focus on the validity and enforceability of a provision of the NBPA Regulations. While the SPAC identifies Paul as a fiduciary of Plaintiff, the fiduciary relationship between the two also existed independent of the SPAC. *See R.P. Small Corp. v. Land Dep't, Inc*., 505 F. Supp. 3d 681, 694 (S.D. Tex. 2020). Moreover, the SPAC does not define the fiduciary duties owed by Paul to Plaintiff, nor does it set forth any standard of conduct or incorporate a standard of conduct from any other document which could be applied to the claims for negligence or gross negligence that have been asserted in this case. Accordingly, proof of breach of the fiduciary duty and Defendants' negligence relies upon reference to external standards of care created by common law – which is outside the scope of the matter contemplated to be arbitrated by the NBPA Regulations and/or the SPAC.

### B.    The Arbitration Provision Does Not Apply to the Claims Asserted Against Klutch

As Defendants freely admit, Klutch is neither a signatory to the arbitration agreement, nor the NBPA Regulations. *See* Motion, p. 15. Yet, Klutch seeks to obtain the benefits from these documents. Klutch offers two bases for its attempt to invoke the SPAC's arbitration provisions despite not being a party to that agreement: (1) estoppel because the claims against Klutch are intertwined with those against Paul, and (2) Paul's close, agency relationship with Klutch. Motion, p. 15-17. But, a nonsignatory cannot compel arbitration merely because it was an agent of one of the signatories. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 n.10 (5th Cir. 2003) (citing *Westmoreland v. Sadoux*, 299 F.3d 462, 466 (5th Cir. 2002)). Moreover, even the caselaw relied on by Defendants is clear that the degree of interrelatedness necessary to allow a non-

signatory to compel arbitration is extremely fact dependent.  *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005).  Claims are intertwined "where the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause."  *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005).  In *Denney*, the district court explained that the "sine qua non of an appropriate situation for applying equitable estoppel" is "[t]he plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant."  *Id*. at 298.  It is not enough that the dispute between the signatory and nonsignatory is merely related to the agreement containing the arbitration provision.  *See id*. at 300.  Indeed, the court explicitly recognized that it is not the case that claims against even co-conspirators will always be intertwined to a degree sufficient to work an estoppel.  *Id*. at 297–98.

Here, the SPAC's arbitration provision purports to apply to disputes between "The Player and the Agent."  *See* SPAC, § 7.  Defendants' reliance on § 3A of the NBPA Regulations is misplaced; the SPAC only purports to incorporate § 5 of the NBPA Regulations and its arbitration procedures.  Nothing in the SPAC purports to incorporate the NBPA Regulations in their entirety, much less § 3A and the conduct of agency employees.

Moreover, the claims against Paul and Klutch, while related, are not so integrally intertwined to justify equitable estoppel allowing a non-signatory to compel arbitration.

Indeed, Plaintiff's allegations include claims against Klutch independent of Paul. For instance, Plaintiff alleges that he contemplated terminating his relationship with Defendants in January 2020, but that he did not do so based on representations from another Klutch employee regarding the possibility of a three-year contract with the Oklahoma City Thunder.  *See* Am. Pet, pp. 8-9.  When considering whether to apply equitable estoppel, courts properly may rely upon the

18

allegations of a plaintiff's Complaint. This Court should not give Klutch the benefit of an arbitration agreement to which it never agreed and to which it cannot be bound.

Defendants' Motion ignores the fact that, even if certain claims might be arbitrated between Plaintiff and Paul, the other claims, including all claims asserted against Klutch, should remain in this Court and the litigation should proceed.

### C.   If the 30-Day Provision is Determined to be Invalid, the Case Could be Bifurcated and Stayed Pending Conclusion of Arbitration Proceedings.

A finding that the 30-day statute of limitations provision is unenforceable as against Plaintiff could either result in the severing of the provision from the agreement to arbitrate or result in a determination that the entire arbitration provision is unenforceable as against Plaintiff. Here, Plaintiff does not dispute that a determination on the <u>substance</u> of some of his legal claims in this case, namely those asserted against Paul under the SPAC, can be made through the pending arbitration proceedings. Indeed, Plaintiff will not oppose arbitration as to the substance of his claims against Paul. However, the issue of whether the 30-Day Provision is valid and enforceable as to Plaintiff is a threshold issue that this Court has the authority to decide, and should decide, before compelling that arbitration. Should the Court determine that the provision is unenforceable and otherwise inapplicable to Plaintiff, Noel would agree to pursue his claims against Paul in the pending arbitration as an alternative to this litigation. In that situation, Plaintiff would likely move the Court to stay the remaining claims against Klutch until the arbitration proceedings are concluded.

## IV.   THERE IS PERSONAL JURISDICTION OVER DEFENDANTS IN TEXAS

### A.   Personal Jurisdiction Standard

A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction

over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993). Because the Texas long-arm statute extends to the limits of federal due process these two steps have been collapsed into one. *Id.* The due process clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has established "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." *Id.* "The minimum contacts inquiry essentially seeks to determine whether the defendant purposefully availed itself of the privilege of conducting activities in Texas, thereby invoking the benefit and protection of Texas laws." *Bellorin v. Bridgestone/Firestone, Inc.*, 236 F. Supp. 2d 670, 678 (W.D. Tex. 2001). "The minimum contacts analysis may be further subdivided into two types of contacts: contacts which result in general personal jurisdiction and contacts which give rise to specific personal jurisdiction." *Border Steel, Inc. v. Pac. Century Customs Serv., Inc.*, 500 F. Supp. 2d 655, 657–58 (W.D. Tex. 2006).

While a plaintiff bears the burden of proving personal jurisdiction, they need only present a *prima facie* case of personal jurisdiction to satisfy that burden. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000). "Proof by a preponderance of the evidence is not required." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "In determining whether a prima facie case exists, this Court must accept as true [Plaintiff's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Southwest Rsch. Inst. v. California Fueling, LLC,* 509 F. Supp. 3d 656, 665 (W.D. Tex. 2020).

In the present case, this Court has, at minimum, specific jurisdiction over Paul and Klutch as a result of their purposefully establishing and maintaining certain minimum contacts with the state of Texas, including but not limiting to, executing a contract with a Texas resident for the purpose of performing services in Texas and for a Texas entity.  Moreover, the claims asserted against the Defendants here arise, at least in part, from the actions of the Defendants in, or directed to, the State of Texas.

**B.      This Court has Specific Jurisdiction over Defendants[6]**

To decide if it can exercise specific jurisdiction, a district court applies a three-prong test: (1) whether the defendant has minimum contacts with the forum state, i.e., did it purposely direct its activities toward the forum state or purposely avail itself of the privilege of conducting activities there; (2) did the plaintiff's cause of action arise out of or result from the defendant's forum-related contacts; and (3) would the exercise of personal jurisdiction be fair and reasonable.  *J.M. Huber Corp. v. Pan Am. Express, Inc.*, 118 F. Supp. 2d 764, 767–68 (S.D. Tex. 2000).  The touchstone is "whether the defendant's conduct shows that it reasonably anticipates being haled into court." *Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*, 414 F. Supp. 3d 960, 969 (W.D. Tex. 2019).  This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts…" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  Jurisdiction may not be avoided merely because the defendant did not physically enter the forum state.  *Id.* at 475–76.

---

[6] For purposes of the present motion, Plaintiff does not address the issue of general jurisdiction. However, Plaintiff believes that jurisdictional discovery will reveal the true extent of Defendants' activities and contacts in Texas, including the number of clients under Texas contracts, performing services in Texas, and the amount of money Defendants have generated through these contracts and business relationships.  Plaintiff has filed a motion for leave to conduct jurisdictional discovery concurrently with this response.

When the case involves a contract, the relevant inquiry includes examining the place of performance of the contract, as well as whether a defendant's contacts with the forum were instrumental in either the formation of the contract or its breach. *Sydow v. Acheson & Co.*, 81 F. Supp. 2d 758, 764–65 (S.D. Tex. 2000). Indeed, "a nonresident can establish contact with the forum by taking purposeful and affirmative action, the effect of which is to cause business activity (foreseeable by the defendant) in the forum state." *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 382 n.6 (5th Cir. 2003).

### 1.   Noel's claims arise from Defendants' contacts in Texas

Here, Defendants purposely availed themselves of the benefits of doing business in Texas, with a Texas resident. At the time Defendants engaged in the first of their pertinent communications giving rise to their contractual and business relationship with Plaintiff and the substantive causes of action, Plaintiff was a Texas resident performing services in Texas. *See* Noel Dec., App. 2-3, ¶¶ 10-17; *see also* Am. Pet., pp. 5-6 ("At the time Noel entered into the SPAC with Paul, Noel lived in Dallas, Texas."). The nature of the communications with Plaintiff in Texas also supports a finding of jurisdiction. When Defendants first began establishing their relationship with Noel, Noel had already received significant offer from the Mavericks for payment of roughly $70 million over the course of 4 years (Am. Pet., p. 3), which contemplated services to be performed by Plaintiff in Texas. Defendants' pitch to Plaintiff was that they could obtain Plaintiff a better offer. *Id.*, p. 4.

After formally entering into a contract with Plaintiff, Defendants began directing their business activity toward Texas by advising Plaintiff – still a Texas resident – to stop negotiations with the Mavericks – a Texas business – for a long-term deal and instead accept the Maverick's previous qualifying offer for a one-year deal. Noel Dec., App. 2-3, ¶¶ 11, 14; Am. Pet., pp. 4-5. In reliance on Defendants' advice, Plaintiff then accepted the offer to play the next season for the

22

Mavericks.  Am. Pet., pp. 4-5.  This contract, which Defendants advised Plaintiff to agree to, contemplated services to be performed in Texas, for a Texas organization.  In return, Defendants were paid 4% of the value of the contract – which totaled roughly $167,000.  Am. Pet., p. 5. Plaintiff then played the entire following season for the Mavericks under a 1-year contract of which Defendants received the benefits.  *Id*.  Over the course of the next year, from August of 2017 until the next NBA free agent season in July of 2018, both Paul and other representatives of Klutch engaged in continuing communications with Plaintiff in Texas related to (a) his performance under the Mavericks' UPC; (b) his injury; (c) his rehabilitation efforts from his injury; (d) his return for the Mavericks following injury; (e) the expiration of his contract in Dallas; and (f) ultimately, the terms of a conditions (and negotiation) of a new contract for Plaintiff for the following season. Noel Dec., App. 4, ¶ 21.  All the while, Plaintiff maintained his residence in Texas.  *Id*., ¶ 22. Defendants purposefully directed their business activity with the state of Texas and their contacts were not the result of "random," "fortuitous," or "attenuated" actions of Plaintiff or a third party.

In their motion, Defendants rely exclusively on the declaration of Paul wherein he focuses only on the following facts: Defendants never resided, owned or leased property, attended school, engaged in employment, or maintained a bank account in Texas.  *See* Paul Dec., Dkt. 4, Ex. A, ¶¶ 8-13.  However, Defendants do not dispute or even address the significant contacts Defendants had with Texas related specifically to the relationship with Plaintiff – especially during the early stages of the relationship.  Nor is there a factual dispute raised as to the nature of the relationships between the parties and/or the facts related to the connection Texas has with this lawsuit.  It is these contacts in Texas which form the basis of specific jurisdiction here, not whether Defendants ever lived or owned property in Texas.

### 2.      Jurisdiction over Defendants in Texas is fair and reasonable

Defendants cannot reasonably contend that jurisdiction over them in Texas would not be fair.  To determine whether exercising jurisdiction is "fair," the court examines several factors relating to "traditional notions of fair play and substantial justice": (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies.  *Felch v. Transportes Lar–Mex SA De CV*, 92 F.3d 320, 324, n. 9 (5th Cir. 1996).

At the time Defendants initiated the communications giving rise to the business, fiduciary and/or contractual relationships at issue, Plaintiff was a Texas resident performing work for a Texas organization.  And Plaintiff continued to be a Texas resident over the course of the next year while Defendants engaged in regular dealings and communications with him.  Defendants knew Plaintiff was located in Texas and was performing services under contract with the Dallas Mavericks.  Given their knowledge of their interactions with Texas, it is not unfair to be expected to appear in court in the state.  If Defendants did not want to subject themselves to jurisdiction in Texas, they could have simply chosen not to do business with Texas residents performing services with Texas organizations.

Defendants, without explanation, state in a conclusory fashion that it would be burdensome and inconvenient for them to have to litigate this case in Texas.  *See* Paul Dec., Dkt. 4, Ex. A, ¶¶ 18 and 25.  Defendants have failed to establish an undue burden.  Defendants consist of a multi-million dollar sports agency representing clients who reside in and/or play for professional sports teams throughout the country – including a number of clients who reside and/or perform services in Texas.  Plaintiff also believes that the nature of Defendants' business demands travel throughout the country in order to meet with clients, negotiate with teams, and attend games. Being

24

accustomed to such traveling, it would not be unreasonable to require Defendants to attend a trial in Texas.[7]  In the least, Noel should be permitted to conduct some limited jurisdictional discovery to determine the true extent of Defendants' contacts in Texas, including specifically, how much money Defendants have generated through services performed in Texas.  While Defendants may prefer to litigate in a more convenient forum for them (such as California or even New York), convenience alone cannot outweigh their knowing and purposeful contacts within and directed to Texas.

Finally, Texas has an interest in deciding this dispute in that involves, at least in part, conduct which effect a citizen of Texas (at the time of the conduct) and involves interpretation of Texas law.[8]  Plaintiff has established a prima facie case of personal jurisdiction over Defendants and their motion to dismiss should be denied.

## CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss and compel arbitration should be denied.

---

[7] Most other activities in the case, aside from any necessary in-person hearings, would not require Defendants to travel to Texas.

[8] The remaining factors are neutral here.

Dated:  November 15, 2021                    Respectfully submitted,


                                             /s/ *Brian P. McGraw*_____

                                             Brian P. McGraw (pro hac vice)
                                             Dennis D. Murrell (pro hac vice to be filed)
                                             Matthew P. Dearmond (pro hac vice to be filed)
                                             MIDDLETON REUTLINGER
                                             401 S. 4th Street, Suite 2600
                                             Louisville, Kentucky 40202
                                             Telephone: (502) 584-1135
                                             Fax: (502) 561-0442
                                             dmurrell@middletonlaw.com
                                             bmcgraw@middletonlaw.com
                                             mdearmond@middletonlaw.com

                                             Craig F. Simon
                                             State Bar No. 00784968
                                             LOEWINSOHN DEARY SIMON RAY LLP
                                             12377 Merit Drive, Suite 900
                                             Dallas, Texas 75251
                                             Telephone: (214) 572-1700
                                             Fax: (214) 572-1717
                                             craigs@ldsrlaw.com

                                             ATTORNEYS FOR PLAINTIFF
                                             NERLENS NOEL


## CERTIFICATE OF SERVICE

        The undersigned hereby certifies that on this 15th day of November, 2021, a true and correct copy of the foregoing document has been served via e-filing upon all counsel of record.


                                             /s/ *Craig F. Simon*_____
                                             Craig F. Simon

26