UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NERLENS NOEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2485 |
| | § | |
| RICHARD PAUL and KLUTCH | § | |
| SPORTS GROUP, LLC, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX TO PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT**

Respectfully submitted,

 /s/ *Craig F. Simon*
Craig F. Simon
State Bar No. 00784968
LOEWINSOHN DEARY SIMON RAY LLP
12377 Merit Drive, Suite 900
Dallas, Texas 75251
Telephone: (214) 572-1700
Fax: (214) 572-1717
craigs@ldsrlaw.com

-and-

Brian P. McGraw (pro hac vice)
Dennis D. Murrell (pro hac vice to be filed)
Matthew P. Dearmond (pro hac vice to be filed)
MIDDLETON REUTLINGER
401 S. 4th Street, Suite 2600
Louisville, Kentucky 40202
Telephone: (502) 584-1135
Fax: (502) 561-0442
dmurrell@middletonlaw.com
bmcgraw@middletonlaw.com
mdearmond@middletonlaw.com

ATTORNEYS FOR PLAINTIFF
NERLENS NOEL

| **DESCRIPTION** | **APPENDIX NUMBER** |
|---|---|
| Declaration of Nerlens Noel | App. 1 - 5 |
| National Basketball Association Uniform Player Contract | App. 6- 29 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of November, 2021, a true and correct copy of the foregoing document has been served via e-filing upon all counsel of record.

 /s/ *Craig F. Simon*
Craig F. Simon

DocuSign Envelope ID: FFC2A77D-00FE-4B59-B38D-6A587E6CF879

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NERLENS NOEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2485 |
| | § | |
| RICHARD PAUL and KLUTCH | § | |
| SPORTS GROUP, LLC, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF NERLENS NOEL

I, Nerlens Noel, under penalty of perjury, depose and state as follows:

1.      I am an individual over the age of twenty-one. I have personal knowledge of the facts stated in this Declaration and am otherwise competent to make this Declaration.

2.      I submit this Declaration in support of my Response to Defendants' Motion to Dismiss.

3.      I am a professional basketball player who currently plays in the National Basketball Association ("NBA").

4.      On June 27, 2013, I was selected by the New Orleans Pelicans in the 2013 National Basketball Association ("NBA") draft. Shortly, thereafter, on July 12, 2013, I was traded to the Philadelphia 76ers.

5.      On February 23, 2017, I was traded from the 76ers to the Dallas Mavericks, and made my debut with the team a couple days later. I was regularly practicing and playing for the Dallas Mavericks starting at the end of February, 2017.

6.      After being traded, I moved to Dallas, Texas and leased property in the city. I initially lived in hotel but then leased various properties in Dallas during my time there.

1

DocuSign Envelope ID: FFC2A77D-00FE-4B59-B38D-6A587E6CF879

7.      I ultimately played 22 games for the team during the remainder of the 2016/17 season. Following the season, I became a restricted free agent.

8.      During this time, I was represented by Happy Walters as my agent of record.

9.      On June 23, 2017, the Mavericks tendered me a $4.1 million qualifying offer which officially made me a restricted free agent.

10.     As the free agent season began in July of 2017, the Mavericks also offered me a long-term contract to sign and play for the team for 4-years at $70 million total. At the time this offer was made, I resided in Texas. When this offer was made, I was still represented by Happy Walters.

11.     That same month, I attended a birthday party for Ben Simmons in Los Angeles, California. During this party, Rich Paul pitched me to become my agent. During this pitch, Mr. Paul stated, among other things, that I was a "100 million man" and that he would get me a max deal if I terminated my existing relationship with my then-agent and signed with him instead.  As part of this discussion, Paul advised me that I should cease negotiations with Dallas and seek a max deal on the free agent market the following season.

12.     Shortly after attending this party, and in reliance on statements from Mr. Paul, I terminated my relationship with Mr. Walters and ultimately entered into a contract with Mr. Paul on August 21, 2017.  This agreement was titled the Standard Player Agent Contract ("SPAC").

13.     At the time I entered into the SPAC with Mr. Paul, I stilled resided in Texas.

14.     After entering into this contract for Mr. Paul to be my agent, Mr. Paul advised me to stop negotiations with the Mavericks and accept their previous qualifying offer. At the time of these discussions, I still resided in Texas. At that time, my discussions with Mr. Paul primarily took place over the phone and through text messaging.

App. 2

DocuSign Envelope ID: FFC2A77D-00FE-4B59-B38D-6A587E6CF879

15.     While playing in Dallas, representatives of Klutch, including Mr. Lucas Newton, came to Dallas on multiple occasions to watch me play.

16.     I accepted the Maverick's qualifying offer in August, 2017, by signing a contract titled National Basketball Association Uniform Player Contract ("the Dallas UPC"). The Dallas UPC called for me to be paid $4,187,599 by the Dallas Mavericks. As my agent, Paul received 4% of the value of the Dallas UPC.

17.     At that time I executed the Dallas UPC, I still resided in Texas. Mr. Paul was identified as my agent on this contract. In return, he received a payment of 4% of the value of the contract and I paid him that money once I was paid from Dallas under the Dallas UPC.

18.     I played the entirety of the 2017/2018 season for the Mavericks, where I continued to reside in Dallas, Texas. During that time, I engaged in regular communications (texts and telephone calls) with Paul and other representatives of Klutch in connection with our player-agent relationship and my services for the Dallas Mavericks. These discussions revolved around, among other things, my performance as a player as well as plans to try and secure me a "max deal" following the season.

19.     The 2017/2018 NBA season began on October 17, 2017 (and ended April 11, 2018).  In December of 2017 I tore a ligament in my thumb and had surgery to repair the ligament and was forced to miss 42 games.  Following the injury I still worked out at the team facility in Dallas and engaged in rehabilitation efforts in Dallas.  I was still residing in Texas at that time and engaged in regular communications with Paul and other employees of Klutch.  These discussions involved my rehabilitation efforts and involved plans to still try and secure a lucrative deal when the NBA season ended and the free agency season began.

App. 3

20.     I returned to finish the season, and ultimately played in a total 30 games for the Mavericks that season.

21.     From August of 2017 until the next NBA free agent season began in July of 2018, both Paul and other representatives of Klutch engaged in continuing communications with me while I was residing and working in Texas.  These communications related to (a) my performance under the Mavericks' UPC; (b) my injury; (c) my rehabilitation efforts from the thumb injury; (d) my return for the Mavericks following injury; (e) the expiration of my contract in Dallas; and (f) the terms of a conditions (and negotiation) of a new contract for me for the following season.

22.     Following the 2017/2018 season, I became an unrestricted free agent. I was still residing in Texas at that time and engaging in regular communications with Paul and other representatives of Klutch.

23.     As the free agency season began, I did not get any long term contract offers, or offers that I believed reflected my true value as a player.  Because Paul failed to secure me any reasonable offers, much less a "max deal", I ended up having to sign a league minimum contract offer from the Oklahoma City Thunder.  At the time I signed the contract with the Thunder I was still residing in Texas.

24.     In January 2020, I began contemplating terminating my relationship with Mr, Paul and expressed concerns to Lucas Newton of Klutch, who informed me that the Thunder were planning on offering me a three-year deal worth between $7 and $10 million per year. I decided not to terminate my relationship with Mr. Paul based on this representation.

25.     After the 2019/2020 season I again entered free agency. Despite Mr. Newton's statements about what the Thunder were planning to offer me, I received no such offer. I also later learned that representative from the Houston Rockets and Los Angeles Clippers had been trying

App. 4

to contact Mr. Paul about potentially offering me a contract, but that Mr. Paul was not taking or returning any of their calls.

26.     Eventually, on November 25, 2020 I signed another one-year deal with the New York Knicks. Mr. Paul played virtually no role in securing or negotiating this deal. Our relationship was ultimately terminated in December of 2020.

27.     Following the 2020/2021 season, and with Mr. Paul and Klutch no longer in the picture, I signed a three-year deal with the New York Knicks for a total of approximately $32 million.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

_____
Nerlens Noel

App. 5



# National Basketball Association

OFFICE OF THE GENERAL COUNSEL

Direct Dial: (212) 407-8382
Direct Fax:  (212) 888-7931

September 11, 2017

Mr. Keith Grant
Dallas Mavericks
American Airlines Center
2500 Victory Ave.
Dallas, TX  75219

Re:  **Nerlens Noel/Dallas Mavericks**
     **Uniform Player Contract**

Dear Keith:

The above-referenced contract, filed with the League Office on August 28, 2017, has been approved by the Commissioner.  Enclosed herewith is one copy of the approved contract.

We have retained a copy of the approved contract for our records.

Sincerely,

Michelle A. Leftwich
Vice President and
Assistant General Counsel

/elr

Enclosure

cc:    National Basketball Players Association



# NATIONAL BASKETBALL ASSOCIATION
# UNIFORM PLAYER CONTRACT

THIS AGREEMENT made this 23rd day of June 2017, is by and between Dallas Basketball Limited (hereinafter called the "Team"), a member of the National Basketball Association (hereinafter called the "NBA" or "League") and Nerlens Noel , an individual whose address is shown below (hereinafter called the "Player"). In consideration of the mutual promises hereinafter contained, the parties hereto promise and agree as follows:

### 1.   TERM.

The Team hereby employs the Player as a skilled basketball player for a term of one (1) year from the 1st day of September 2017.

### 2.   SERVICES.

The services to be rendered by the Player pursuant to this Contract shall include: (a) training camp, (b) practices, meetings, workouts, and skill or conditioning sessions conducted by the Team during the Season, (c) games scheduled for the Team during any Regular Season, (d) Exhibition games scheduled by the Team or the League during and prior to any Regular Season, (e) if the Player is invited to participate, the NBA's All-Star Game (including the Rookie-Sophomore Game) and every event conducted in association with such All-Star Game, but only in accordance with Article XXI of the Collective Bargaining Agreement currently in effect between the NBA and the National Basketball Players Association (hereinafter the "CBA"), (f) Playoff games scheduled by the League subsequent to any Regular Season, (g) promotional and commercial activities of the Team and the League as set forth in this Contract and the CBA and (h) any NBADL Work Assignment in accordance with Article XLI of the CBA.

### 3.   COMPENSATION.

(a)   Subject to paragraph 3(b) below, the Team agrees to pay the Player for rendering the services and performing the obligations described herein the Compensation described in Exhibit 1 or Exhibit 1A hereto (less all amounts required to be withheld by any governmental authority, and exclusive of any amount(s) which the Player shall be entitled to receive from the Player Playoff Pool). Unless otherwise provided in Exhibit 1 or Exhibit 1A, such Compensation shall be paid in twenty-four (24) equal semi-monthly payments beginning with the first of said payments on November 15th of each year covered by the Contract and continuing with such payments on the first and fifteenth of each month until said Compensation is paid in full.

(b)     The Team agrees to pay the Player $2,000 per week, pro rata, less all amounts required to be withheld by any governmental authority, for each week (up to a maximum of four (4) weeks for Veterans and up to a maximum of five (5) weeks for Rookies) prior to the Team's first Regular Season game that the Player is in attendance at training camp or Exhibition games; provided, however, that no such payments shall be made if, prior to the date on which he is required to attend training camp, the Player has been paid $10,000 or more in Compensation with respect to the NBA Season scheduled to commence immediately following such training camp. Any Compensation paid by the Team pursuant to this subparagraph shall be considered an advance against any Compensation owed to the Player pursuant to paragraph 3(a) above, and the first scheduled payment of such Compensation (or such subsequent payments, if the first scheduled payment is not sufficient) shall be reduced by the amount of such advance.

(c)     The Team will not pay and the Player will not accept any bonus or anything of value on account of the Team's winning any particular NBA game or series of games or attaining a certain position in the standings of the League as of a certain date, other than the final standing of the Team.

## 4.     EXPENSES.

The Team agrees to pay all proper and necessary expenses of the Player, including the reasonable lodging expenses of the Player while playing for the Team "on the road" and during the training camp period (defined for this paragraph only to mean the period from the first day of training camp through the day of the Team's first Exhibition game) for as long as the Player is not then living at home. The Player, while "on the road" (and during the training camp period, only if the Player is not then living at home and the Team does not pay for meals directly), shall be paid a meal expense allowance as set forth in the CBA. No deductions from such meal expense allowance shall be made for meals served on an airplane. During the training camp period (and only if the Player is not then living at home and the Team does not pay for meals directly), the meal expense allowance shall be paid in weekly installments commencing with the first week of training camp. For the purposes of this paragraph, the Player shall be considered to be "on the road" from the time the Team leaves its home city until the time the Team arrives back at its home city.

## 5.     CONDUCT.

(a)     The Player agrees to observe and comply with all Team rules, as maintained or promulgated in accordance with the CBA, at all times whether on or off the playing floor. Subject to the provisions of the CBA, such rules shall be part of this Contract as fully as if herein written and shall be binding upon the Player.

(b)     The Player agrees: (i) to give his best services, as well as his loyalty, to the Team, and to play basketball only for the Team and its assignees; (ii) to be neatly and fully attired in public; (iii) to conduct himself on and off the court according to the highest standards of honesty, citizenship, and sportsmanship; and (iv) not to do anything that is materially detrimental or materially prejudicial to the best interests of the Team or the League.

2

(c)     For any violation of Team rules, any breach of any provision of this Contract, or for any conduct impairing the faithful and thorough discharge of the duties incumbent upon the Player, the Team may reasonably impose fines and/or suspensions on the Player in accordance with the terms of the CBA.

(d)     The Player agrees to be bound by Article 35 of the NBA Constitution, a copy of which, as in effect on the date of this Contract, is attached hereto. The Player acknowledges that the Commissioner is empowered to impose fines upon and/or suspend the Player for causes and in the manner provided in such Article, provided that such fines and/or suspensions are consistent with the terms of the CBA.

(e)     The Player agrees that if the Commissioner, in his sole judgment, shall find that the Player has bet, or has offered or attempted to bet, money or anything of value on the outcome of any game participated in by any team which is a member of the NBA, the Commissioner shall have the power in his sole discretion to suspend the Player indefinitely or to expel him as a player for any member of the NBA, and the Commissioner's finding and decision shall be final, binding, conclusive, and unappealable.

(f)     The Player agrees that he will not, during the term of this Contract, directly or indirectly, entice, induce, or persuade, or attempt to entice, induce, or persuade, any player or coach who is under contract to any NBA team to enter into negotiations for or relating to his services as a basketball player or coach, nor shall he negotiate for or contract for such services, except with the prior written consent of such team. Breach of this subparagraph, in addition to the remedies available to the Team, shall be punishable by fine and/or suspension to be imposed by the Commissioner.

(g)     When the Player is fined and/or suspended by the Team or the NBA, he shall be given notice in writing (with a copy to the Players Association), stating the amount of the fine or the duration of the suspension and the reasons therefor.

## 6.     WITHHOLDING.

(a)     In the event the Player is fined and/or suspended by the Team or the NBA, the Team shall withhold the amount of the fine or, in the case of a suspension, the amount provided in Article VI of the CBA from any Current Base Compensation due or to become due to the Player with respect to the contract year in which the conduct resulting in the fine and/or the suspension occurred (or a subsequent contract year if the Player has received all Current Base Compensation due to him for the then current contract year). If, at the time the Player is fined and/or suspended, the Current Base Compensation remaining to be paid to the Player under this Contract is not sufficient to cover such fine and/or suspension, then the Player agrees promptly to pay the amount directly to the Team. In no case shall the Player permit any such fine and/or suspension to be paid on his behalf by anyone other than himself.

(b)     Any Current Base Compensation withheld from or paid by the Player pursuant to this paragraph 6 shall be retained by the Team or the League, as the case may be, unless the Player contests the fine and/or suspension by initiating a timely Grievance in accordance with the provisions of the CBA. If such Grievance is initiated and it satisfies Article XXXI, Section 14 of

3

the CBA, the amount withheld from the Player shall be placed in an interest-bearing account, pursuant to Article XXXI, Section 10 of the CBA, pending the resolution of the Grievance.

### 7.   PHYSICAL CONDITION.

(a)     The Player agrees to report at the time and place fixed by the Team in good physical condition and to keep himself throughout each NBA Season in good physical condition.

(b)     If the Player, in the judgment of the Team's physician, is not in good physical condition at the date of his first scheduled game for the Team, or if, at the beginning of or during any Season, he fails to remain in good physical condition (unless such condition results directly from an injury sustained by the Player as a direct result of participating in any basketball practice or game played for the Team during such Season), so as to render the Player, in the judgment of the Team's physician, unfit to play skilled basketball, the Team shall have the right to suspend such Player until such time as, in the judgment of the Team's physician, the Player is in sufficiently good physical condition to play skilled basketball. In the event of such suspension, the Base Compensation payable to the Player for any Season during such suspension shall be reduced in the same proportion as the length of the period during which, in the judgment of the Team's physician, the Player is unfit to play skilled basketball, bears to the length of such Season. Nothing in this subparagraph shall authorize the Team to suspend the Player solely because the Player is injured or ill.

(c)     If, during the term of this Contract, the Player is injured as a direct result of participating in any basketball practice or game played for the Team, the Team will pay the Player's reasonable hospitalization and medical expenses (including doctor's bills), provided that the hospital and doctor are selected by the Team, that the Team shall be obligated to pay only those expenses incurred as a direct result of medical treatment caused solely by and relating directly to the injury sustained by the Player. Subject to the provisions set forth in Exhibit 3, if in the judgment of the Team's physician, the Player's injuries resulted directly from playing for the Team and render him unfit to play skilled basketball, then, so long as such unfitness continues, but in no event after the Player has received his full Base Compensation for the Season in which the injury was sustained, the Team shall pay to the Player the Base Compensation prescribed in Exhibit 1 to this Contract for such Season. The Team's obligations hereunder shall be reduced by (i) any workers' compensation benefits, which, to the extent permitted by law, the Player hereby assigns to the Team, and (ii) any insurance provided for by the Team whether paid or payable to the Player.

(d)     The Player agrees to provide to the Team's coach, trainer, or physician prompt notice of any injury, illness, or medical condition suffered by him that is likely to affect adversely the Player's ability to render the services required under this Contract, including the time, place, cause, and nature of such injury, illness, or condition.

(e)     Should the Player suffer an injury, illness, or medical condition, he will submit himself to a medical examination, appropriate medical treatment by a physician designated by the Team, and such rehabilitation activities as such physician may specify. Such examination when made at the request of the Team shall be at its expense, unless made necessary by some act or conduct of the Player contrary to the terms of this Contract.

4

(f)     The Player agrees (i) to submit to a physical examination at the commencement and conclusion of each Contract year hereunder, and at such other times as reasonably determined by the Team to be medically necessary, and (ii) at the commencement of this Contract, and upon the request of the Team, to provide a complete prior medical history.

(g)     The Player agrees to supply complete and truthful information in connection with any medical examinations or requests for medical information authorized by this Contract.

(h)     A Player who consults or is treated by a physician (including a psychiatrist) or a professional providing non-mental health related medical services (e.g., chiropractor, physical therapist) other than a physician or other professional designated by the Team shall give notice of such consultation or treatment to the Team and shall authorize and direct such other physician or professional to provide the Team with all information it may request concerning any condition that in the judgment of the Team's physician may affect the Player's ability to play skilled basketball.

(i)     If and to the extent necessary to enable or facilitate the disclosure of medical information as provided for by this Contract or Article XXII or XXXIII of the CBA, the Player shall execute such individual authorization(s) as may be requested by the Team or the Medical Director of the Anti-Drug Program or as may be required by health care providers who examine or treat the Player.

8.     PROHIBITED SUBSTANCES.

The Player acknowledges that this Contract may be terminated in accordance with the express provisions of Article XXXIII (Anti-Drug Program) of the CBA, and that any such termination will result in the Player's immediate dismissal and disqualification from any employment by the NBA and any of its teams. Notwithstanding any terms or provisions of this Contract (including any amendments hereto), in the event of such termination, all obligations of the Team, including obligations to pay Compensation, shall cease, except the obligation of the Team to pay the Player's earned Compensation (whether Current or Deferred) to the date of termination.

9.     UNIQUE SKILLS.

The Player represents and agrees that he has extraordinary and unique skill and ability as a basketball player, that the services to be rendered by him hereunder cannot be replaced or the loss thereof adequately compensated for in money damages, and that any breach by the Player of this Contract will cause irreparable injury to the Team, and to its assignees. Therefore, it is agreed that in the event it is alleged by the Team that the Player is playing, attempting or threatening to play, or negotiating for the purpose of playing, during the term of this Contract, for any other person, firm, entity, or organization, the Team and its assignees (in addition to any other remedies that may be available to them judicially or by way of arbitration) shall have the right to obtain from any court or arbitrator having jurisdiction such equitable relief as may be appropriate, including a decree enjoining the Player from playing basketball for any other person, firm, entity, or organization during the term of this Contract. The Player agrees that this right may be enforced

5

by the Team or the NBA. In any suit, action, or arbitration proceeding brought to obtain such equitable relief, the Player does hereby waive his right, if any, to trial by jury, and does hereby waive his right, if any, to interpose any counterclaim or set-off for any cause whatever.

### 10.   ASSIGNMENT.

(a)   The Team shall have the right to assign this Contract to any other NBA team, and the Player agrees to accept such assignment and to faithfully perform and carry out this Contract with the same force and effect as if it had been entered into by the Player with the assignee team instead of with the Team.

(b)   In the event that this Contract is assigned to any other NBA team, all reasonable expenses incurred by the Player in moving himself and his family to the home territory of the team to which such assignment is made, as a result thereof, shall be paid by the assignee team.

(c)   In the event that this Contract is assigned to another NBA team, the Player shall forthwith be provided notice orally or in writing, delivered to the Player personally or delivered or mailed to his last known address, and the Player shall report to the assignee team within forty-eight (48) hours after said notice has been received (if the assignment is made during a Season), within one (1) week after said notice has been received (if the assignment is made between Seasons), or within such longer time for reporting as may be specified in said notice. The NBA shall also promptly notify the Players Association of any such assignment. The Player further agrees that, immediately upon reporting to the assignee team, he will submit upon request to a physical examination conducted by a physician designated by the assignee team.

(d)   If the Player, without a reasonable excuse, does not report to the team to which this Contract has been assigned within the time provided in subsection (c) above, then (i) upon consummation of the assignment, the Player may be disciplined by the assignee team or, if the assignment is not consummated or is voided as a result of the Player's failure to so report, by the assignor Team, and (ii) such conduct shall constitute conduct prejudicial to the NBA under Article 35(d) of the NBA Constitution, and shall therefore subject the Player to discipline from the NBA in accordance with such Article.

### 11.   VALIDITY AND FILING.

(a)   This Contract shall be valid and binding upon the Team and the Player immediately upon its execution.

(b)   The Team agrees to file a copy of this Contract, and/or any amendment(s) thereto, with the Commissioner of the NBA as soon as practicable by facsimile or email and overnight mail, but in no event may such filing be made more than forty-eight (48) hours after the execution of this Contract and/or amendment(s).

(c)   If pursuant to the NBA Constitution and By-Laws or the CBA, the Commissioner disapproves this Contract (or amendment) within ten (10) days after the receipt thereof in his office by overnight mail, this Contract (or amendment) shall thereupon terminate and be of no further force or effect and the Team and the Player shall thereupon be relieved of their respective rights and liabilities thereunder. If the Commissioner's disapproval is subsequently overturned

6

in any proceeding brought under the arbitration provisions of the CBA (including any appeals), the Contract shall again be valid and binding upon the Team and the Player, and the Commissioner shall be afforded another ten-day period to disapprove the Contract (based on the Team's Room at the time the Commissioner's disapproval is overturned) as set forth in the foregoing sentence. The NBA will promptly inform the Players Association if the Commissioner disapproves this Contract.

### 12. PROHIBITED ACTIVITIES.

The Player and the Team acknowledge and agree that the Player's participation in certain other activities may impair or destroy his ability and skill as a basketball player, and the Player's participation in any game or exhibition of basketball other than at the request of the Team may result in injury to him. Accordingly, the Player agrees that he will not, without the written consent of the Team, engage in any activity that a reasonable person would recognize as involving or exposing the participant to a substantial risk of bodily injury including, but not limited to: (i) sky-diving, hang gliding, snow skiing, rock or mountain climbing (as distinguished from hiking), rappelling, and bungee jumping; (ii) any fighting, boxing, or wrestling; (iii) driving or riding on a motorcycle or moped; (iv) riding in or on any motorized vehicle in any kind of race or racing contest; (v) operating an aircraft of any kind; (vi) engaging in any other activity excluded or prohibited by or under any insurance policy which the Team procures against the injury, illness or disability to or of the Player, or death of the Player, for which the Player has received written notice from the Team prior to the execution of this Contract; or (vii) participating in any game or exhibition of basketball, football, baseball, hockey, lacrosse, or other team sport or competition. If the Player violates this Paragraph 12, he shall be subject to discipline imposed by the Team and/or the Commissioner of the NBA. Nothing contained herein shall be intended to require the Player to obtain the written consent of the Team in order to enable the Player to participate in, as an amateur, the sports of golf, tennis, handball, swimming, hiking, softball, volleyball, and other similar sports that a reasonable person would not recognize as involving or exposing the participant to a substantial risk of bodily injury.

### 13. PROMOTIONAL ACTIVITIES.

(a)    The Player agrees to allow the Team, the NBA, or any League-related entity to take pictures of the Player, alone or together with others, for still photographs. motion pictures, television, or other Media (as such term is defined in Article XXVIII of the CBA), at such reasonable times as the Team. the NBA or the League-related entity may designate. No matter by whom taken, such images may be used in any manner desired by either the Team, the NBA, or the League-related entity for publicity or promotional purposes for Teams or the NBA. The rights in any such images taken by the Team, the NBA, or the League-related entity shall belong to the Team, the NBA, or the League-related entity, as their interests may appear.

(b)    The Player agrees that, during any year of this Contract, he will not make public appearances, participate in radio or television programs, permit his picture to be taken, write or sponsor newspaper or magazine articles, or sponsor commercial products without the written consent of the Team. which shall not be withheld except in the reasonable interests of the Team or the NBA. The foregoing shall be interpreted in accordance with the decision in *Portland Trail Blazers v. Darnell Valentine and Jim Paxson*, Decision 86-2 (August 13, 1986).

7

(c)    Upon request, the Player shall consent to and make himself available for interviews by representatives of the media conducted at reasonable times.

(d)    In addition to the foregoing, and subject to the conditions and limitations set forth in Article II, Section 8 of the CBA, the Player agrees to participate, upon request, in all other reasonable promotional activities of the Team, the NBA, and any League-related entity.  For each such promotional appearance made on behalf of a commercial sponsor of the Team, the Team agrees to pay the Player $3,000 (or, commencing with the 2017-18 Salary Cap Year, $3,500) subject to Article II, Section 8 of the CBA, or, if the Team agrees, such higher amount that is consistent with the Team's past practice and not otherwise unreasonable.

### 14.    GROUP LICENSE AND LEAGUE PROMOTION.

(a)    The Player hereby grants to NBA Properties, Inc. (and its related entities) the exclusive rights to use the Player's Player Attributes as such term is defined and for such group licensing purposes as are set forth in the Agreement between NBA Properties, Inc. and the National Basketball Players Association, made as of September 18, 1995 and amended January 20, 1999, July 29, 2005 and December 8, 2011 (the "Group License"), a copy of which will, upon his request, be furnished to the Player; and the Player agrees to make the appearances called for by such Agreement.

(b)    Notwithstanding anything to the contrary contained in the Group License, the CBA or this Contract, the NBA, all League- related entities, and the Teams may use, and may authorize others to use, in connection with League Promotions, the Player's Player Attributes (as defined in the Group License). The NBA, all League-related entities and the Teams shall be entitled to use the Player's Player Attributes individually pursuant to the preceding sentence and shall not be required to use the Player's Player Attributes in a group or as one of multiple players. As used herein, League Promotion shall mean any and all uses intended to publicize, promote or market, in any way (including in any and all Media) (i) the NBA, any League-related entity that generates BRI (as defined in Article VII of the CBA), any Team or any Player, (ii) any game in which a Team participates (including a Pre-Season, Exhibition, Regular Season, and Playoff game), (iii) any telecast, broadcast or other exhibition or distribution of any such game or of any NBA or Team-related program or content, (iv) any NBA or Team-related facility or platform or any public service, promotional, advertising, marketing program or other activity conducted or authorized by the NBA, a League-related entity that generates BRI or a Team or (v) the sport of basketball.  For purposes of clarity, the foregoing rights of the NBA, League-related entities and the Teams include the right and authority to use, and to authorize others to use, after the term of this Contract, any Player Attributes fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Contract solely for the purposes described herein. The foregoing does not confer any right or authority to use the Player's Player Attributes in a manner that constitutes an unauthorized Endorsement (as such term is defined and clarified in Article XXVIII of the CBA).

(c)    The Player does not and will not contest during or after the term of this Contract, and the Player hereby acknowledges, the exclusive rights of the NBA, all League-related entities that generate BRI and the Teams (i) to telecast, broadcast, or otherwise distribute, transmit, exhibit or perform, on a live, delayed, or archived basis, in any and all Media, any performance

8

by the Player under this Contract or the CBA (including in NBA games or any excerpts thereof) and (ii) to produce, license, offer for sale, sell, market, or otherwise, exhibit, distribute, transmit or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any such performance in any and all Media, including, but not limited to, as part of programming or a content offering or in packaged or other electronic or digital media. The foregoing does not confer any right or authority to use the Player's Player Attributes in a manner that constitutes an unauthorized Endorsement (as such term is defined and clarified in Article XXVIII of the CBA).

## 15.    TEAM DEFAULT.

In the event of an alleged default by the Team in the payments to the Player provided for by this Contract, or in the event of an alleged failure by the Team to perform any other material obligation that it has agreed to perform hereunder, the Player shall notify both the Team and the League in writing of the facts constituting such alleged default or alleged failure. If neither the Team nor the League shall cause such alleged default or alleged failure to be remedied within five (5) days after receipt of such written notice, the National Basketball Players Association shall, on behalf of the Player, have the right to request that the dispute concerning such alleged default or alleged failure be referred immediately to the Grievance Arbitrator in accordance with the provisions of the CBA. If, as a result of such arbitration, an award issues in favor of the Player, and if neither the Team nor the League complies with such award within ten (10) days after the service thereof, the Player shall have the right, by a further written notice to the Team and the League, to terminate this Contract.

## 16.    TERMINATION.

(a)    The Team may terminate this Contract upon written notice to the Player if the Player shall:

(i)    at any time, fail, refuse, or neglect to conform his personal conduct to standards of good citizenship, good moral character (defined here to mean not engaging in acts of moral turpitude, whether or not such acts would constitute a crime), and good sportsmanship, to keep himself in first class physical condition, or to obey the Team's training rules;

(ii)    at any time commit a significant and inexcusable physical attack against any official or employee of the Team or the NBA (other than another player), or any person in attendance at any NBA game or event, considering the totality of the circumstances, including (but not limited to) the degree of provocation (if any) that may have led to the attack, the nature and scope of the attack, the Player's state of mind at the time of the attack, and the extent of any injury resulting from the attack;

(iii)    at any time, fail, in the sole opinion of the Team's management, to exhibit sufficient skill or competitive ability to qualify to continue as a member of the Team; provided, however, (A) that if this Contract is terminated by the Team, in accordance with the provisions of this subparagraph, prior to January 10 of any

9

Season, and the Player, at the time of such termination, is unfit to play skilled basketball as the result of an injury resulting directly from his playing for the Team, the Player shall (subject to the provisions set forth in Exhibit 3) continue to receive his full Base Compensation, less all workers' compensation benefits (which, to the extent permitted by law, and if not deducted from the Player's Compensation by the Team, the Player hereby assigns to the Team) and any insurance provided for by the Team paid or payable to the Player by reason of said injury, until such time as the Player is fit to play skilled basketball, but not beyond the Season during which such termination occurred; and provided, further, (B) that if this Contract is terminated by the Team, in accordance with the provisions of this subparagraph, during the period from the January 10 of any Season through the end of such Season, the Player shall be entitled to receive his full Base Compensation for said Season; or

(iv)     at any time, fail, refuse, or neglect to render his services hereunder or in any other manner materially breach this Contract.

(b)      If this Contract is terminated by the Team by reason of the Player's failure to render his services hereunder due to disability caused by an injury to the Player resulting directly from his playing for the Team and rendering him unfit to play skilled basketball, and notice of such injury is given by the Player as provided herein, the Player shall (subject to the provisions set forth in Exhibit 3) be entitled to receive his full Base Compensation for the Season in which the injury was sustained, less all workers' compensation benefits (which, to the extent permitted by law, and if not deducted from the Player's Compensation by the Team, the Player hereby assigns to the Team) and any insurance provided for by the Team paid or payable to the Player by reason of said injury.

(c)      Notwithstanding the provisions of paragraph 16(b) above, if this Contract is terminated by the Team prior to the first game of a Regular Season by reason of the Player's failure to render his services hereunder due to an injury or condition sustained or suffered during a preceding Season, or after such Season but prior to the Player's participation in any basketball practice or game played for the Team, payment by the Team of any Compensation earned through the date of termination under paragraph 3(b) above, payment of the Player's board, lodging, and expense allowance during the training camp period, payment of the reasonable traveling expenses of the Player to his home city, and the expert training and coaching provided by the Team to the Player during the training season shall be full payment to the Player.

(d)      If this Contract is terminated by the Team during the period designated by the Team for attendance at training camp, payment by the Team of any Compensation earned through the date of termination under paragraph 3(b) above, payment of the Player's board, lodging, and expense allowance during such period to the date of termination, payment of the reasonable traveling expenses of the Player to his home city, and the expert training and coaching provided by the Team to the Player during the training season shall be full payment to the Player.

(e)      If this Contract is terminated by the Team after the first game of a Regular Season, except in the case provided for in subparagraphs (a)(iii) and (b) of this paragraph 16, the

10

Player shall be entitled to receive as full payment hereunder a sum of money which, when added to the salary which he has already received during such Season, will represent the same proportionate amount of the annual sum set forth in Exhibit 1 or Exhibit 1A hereto as the number of days of such Regular Season then past bears to the total number of days of such Regular Season, plus the reasonable traveling expenses of the Player to his home.

(f)  If the Team proposes to terminate this Contract in accordance with subparagraph (a) of this paragraph 16, it must first comply with the following waiver procedure:

(i)  The Team shall request the NBA Commissioner to request waivers from all other clubs. Such waiver request may not be withdrawn.

(ii)  Upon receipt of the waiver request, any other team may claim assignment of this Contract at such waiver price as may be fixed by the League, the priority of claims to be determined in accordance with the NBA Constitution and By-Laws.

(iii)  If this Contract is so claimed, the Team agrees that it shall, upon the assignment of this Contract to the claiming team, notify the Player of such assignment as provided in paragraph 10(c) hereof, and the Player agrees he shall report to the assignee team as provided in said paragraph 10(c).

(iv)  If the Contract is not claimed prior to the expiration of the waiver period, it shall terminate and the Team shall promptly deliver written notice of termination to the Player.

(v)  The NBA shall promptly notify the Players Association of the disposition of any waiver request.

(vi)  To the extent not inconsistent with the foregoing provisions of this subparagraph (f), the waiver procedures set forth in the NBA Constitution and By-Laws, a copy of which, as in effect on the date of this Contract, is attached hereto, shall govern.

(g)  Upon any termination of this Contract by the Player, all obligations of the Team to pay Compensation shall cease on the date of termination, except the obligation of the Team to pay the Player's Compensation to said date.

17.  **DISPUTES.**

In the event of any dispute arising between the Player and the Team relating to any matter arising under this Contract, or concerning the performance or interpretation thereof (except for a dispute arising under paragraph 9 hereof), such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set forth in Article XXXI of the CBA.

11

18.    PLAYER NOT A MEMBER.

Nothing contained in this Contract or in any provision of the NBA Constitution and By-Laws shall be construed to constitute the Player a member of the NBA or to confer upon him any of the rights or privileges of a member thereof.

19.    RELEASE.

The Player hereby releases and waives any and all claims he may have, or that may arise during the term of this Contract, against (a) the NBA and its related entities, the NBADL and its related entities, and every member of the NBA or the NBADL, and every director, officer, owner, stockholder, trustee, partner, and employee of the NBA, NBADL and their respective related entities and/or any member of the NBA or NBADL and their related entities (excluding persons employed as players by any such member), and (b) any person retained by the NBA and/or the Players Association in connection with the NBA/NBPA Anti-Drug Program, the Grievance Arbitrator, the System Arbitrator, and any other arbitrator or expert retained by the NBA and/or the Players Association under the terms of the CBA, in both cases (a) and (b) above, arising out of, or in connection with, and whether or not by negligence, (i) any injury that is subject to the provisions of paragraph 7 hereof, (ii) any fighting or other form of violent and/or unsportsmanlike conduct occurring during the course of any practice, any NBADL game, and/or any NBA Exhibition, Regular Season, and/or Playoff game (in all cases on or adjacent to the playing floor or in or adjacent to any facility used for such practices or games), (iii) the testing procedures or the imposition of any penalties set forth in paragraph 8 hereof and in the NBA/NBPA Anti-Drug Program, or (iv) any injury suffered in the course of his employment as to which he has or would have a claim for workers' compensation benefits. The foregoing shall not apply to any claim of medical malpractice against a Team-affiliated physician or other medical personnel.

20.    ENTIRE AGREEMENT.

This Contract (including any Exhibits hereto) contains the entire agreement between the parties and, except as provided in the CBA, sets forth all components of the Player's Compensation from the Team or any Team Affiliate, and there are no other agreements or transactions of any kind (whether disclosed or undisclosed to the NBA), express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings, of any kind (whether disclosed or undisclosed to the NBA) (a) concerning any future Renegotiation, Extension, or other amendment of this Contract or the entry into any new Player Contract, or (b) involving compensation or consideration of any kind (including, without limitation, an investment or business opportunity) to be paid, furnished, or made available to the Player, or any person or entity controlled by, related to, or acting with authority on behalf of the Player, by the Team or any Team Affiliate.

12

## EXAMINE THIS CONTRACT CAREFULLY BEFORE SIGNING IT

THIS CONTRACT INCLUDES EXHIBITS 1, 2, 5, 6 and 7, WHICH ARE ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF the Player has hereunto signed his name and the Team has caused this Contract to be executed by its duly authorized officer.

Team:
DALLAS BASKETBALL LIMITED

Dated: June 23, 2017

By: _____
Name:   Donnie Nelson
Title:   President of Basketball Operations

Dated: 8/22/17

Player:   Nerlens Noel

Player's Address:
c/o Rich Paul
Klutch Sports
200 Public Square Suite 2580
Cleveland, Ohio 44114

COMMISSIONER

SEP 1 1 2017

13

## EXCERPT FROM NBA CONSTITUTION

## MISCONDUCT

35.    The provisions of this Article 35 shall govern all Players in the Association, hereinafter referred to as "Players."

(a)    Each Member shall provide and require in every contract with any of its Players that they shall be bound and governed by the provisions of this Article. Each Member, at the direction of the Board of Governors or the Commissioner, as the case may be, shall take such action as the Board or the Commissioner may direct in order to effectuate the purposes of this Article.

(b)    The Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its Members, of any Player found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding or attempting to cause any game of basketball to result otherwise than on its merits.

(c)    If in the opinion of the Commissioner any act or conduct of a Player at or during an Exhibition, Regular Season, or Playoff game has been prejudicial to or against the best interests of the Association or the game of basketball, the Commissioner shall impose upon such Player a fine not exceeding $50,000, or may order for a time the suspension of any such Player from any connection or duties with Exhibition, Regular Season, or Playoff games, or he may order both such fine and suspension.

(d)    The Commissioner shall have the power to suspend for a definite or indefinite period, or to impose a fine not exceeding $50,000, or inflict both such suspension and fine upon any Player who, in his opinion, (i) shall have made or caused to be made any statement having, or that was designed to have, an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a Member, or (ii) shall have been guilty of conduct that does not conform to standards of morality or fair play, that does not comply at all times with all federal, state, and local laws, or that is prejudicial or detrimental to the Association.

(e)    Any Player who, directly or indirectly, entices, induces, persuades or attempts to entice, induce, or persuade any Player, Coach, Trainer, General Manager or any other person who is under contract to any other Member of the Association to enter into negotiations for or relating to his services or negotiates or contracts for such services shall, on being charged with such tampering, be given an opportunity to answer such charges after due notice and the Commissioner shall have the power to decide whether or not the charges have been sustained; in the event his decision is that the charges have been sustained, then the Commissioner shall have the power to suspend such Player for a definite or indefinite period, or to impose a fine not exceeding $50,000, or inflict both such suspension and fine upon any such Player.

(f)    Any Player who, directly or indirectly, wagers money or anything of value on the outcome of any game played by a Team in the league operated by the Association shall, on being charged with such wagering, be given an opportunity to answer such charges after due notice, and the decision of the Commissioner shall be final, binding and conclusive and unappealable.

14

The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its Members.

(g)     Except for a penalty imposed under Paragraph (f) of this Article 35: (i) any challenge by a Team to the decisions and acts of the Commissioner pursuant to Article 35 shall be appealable to the Board of Governors, who shall determine such appeals in accordance with such rules and regulations as may be adopted by the Board in its absolute and sole discretion, and (ii) any challenge by a Player to the decisions or acts of the Commissioner pursuant to Article 35 shall be governed by the provisions of Article XXXI of the NBA/NBPA Collective Bargaining Agreement then in effect.

15

## EXCERPT FROM NBA BY-LAWS

5.01. *Waiver Right.* Except for sales and trading between Members in accordance with these By-Laws, no Member shall sell, option, or otherwise assign the contract with, right to the services of, or right to negotiate with, a Player without complying with the waiver procedure prescribed by this Constitution and By-Laws.

5.02. *Waiver Price.* The waiver price shall be $1,000 per Player.

5.03. *Waiver Procedure.* A Member desiring to secure waivers on a Player shall notify the Commissioner or the Commissioner's designee, who shall, on behalf of such Member, immediately notify all other Members of the waiver request. Such Player shall be assumed to have been waived unless a Member shall notify the Commissioner or the Commissioner's designee in accordance with Section 5.04 of a claim to the rights to such Player. Once a Member has notified the Commissioner or the Commissioner's designee of its desire to secure waivers on a Player, such notice may not be withdrawn. A Player remains the financial responsibility of the Member placing him on waivers until the waiver period set by the Commissioner or the Commissioner's designee has expired.

5.04. *Waiver Period.* If the Commissioner or the Commissioner's designee distributes notice of request for waiver, any Members wishing to claim rights to the Player shall do so by giving notice by telephone and in a Writing of such claim to the Commissioner or the Commissioner's designee within forty-eight (48) hours after the time of such notice. A Team may not withdraw a claim to the rights to a Player on waivers. Notwithstanding Article 40 of the NBA Constitution, Saturdays, Sundays and legal holidays shall be included when computing the above-referenced waiver period.

5.05. *Waiver Preferences.*

(a)   In the event that more than one (1) Member shall have claimed the rights to a Player placed on waivers, the claiming Member with the lowest team standing at the time the waiver was requested shall be entitled to acquire the rights to such Player. If the request for waiver shall occur after the last day of the Season and before 11:59 p.m. eastern time on the following November 30, the standings at the close of the previous Season shall govern.

(b)   If the winning percentage of two (2) claiming Teams are the same, then the tie shall be determined, if possible, on the basis of the Regular Season Games between the two (2) Teams during the Season or during the preceding Season, as the case may be. If still tied, a toss of a coin shall determine priority. For the purpose of determining standings, both Conferences of the Association shall be deemed merged and a consolidated standing shall control.

5.06. *Players Acquired Through Waivers.* A Member who has acquired the rights and title to the contract of a Player through the waiver procedure may not sell or trade such rights for a period of thirty (30) days after the acquisition thereof; provided, however, that if the rights to such Player were acquired between Seasons, the 30-day period described herein shall begin on the first day of the next succeeding Season.

16

5.07.  *Additional Waiver Rules*.  The Commissioner or the Board of Governors may from time to time adopt additional rules (supplementary to those set forth in this Section 5) with respect to the operation of the waiver procedure.  Such rules shall not be inconsistent with the provisions of this Section 5 and shall apply to but shall not be limited to the mechanics of notice, inadvertent omission of notification to a Member, and rules of construction as to time.

## AGENT CERTIFICATION

(To be completed only if Player was represented by an agent who negotiated the terms of this Contract.)

I, the undersigned, having negotiated this Contract on behalf of **NERLENS NOEL**, do hereby swear and certify, under penalties of perjury, that the terms of Paragraph 20 of this Contract ("Entire Agreement") are true and correct to the best of my knowledge and belief.

Player Representative

RICH PAUL

State of _Ohio_

County of _Cuyahoga_

On _August 23, 17_, before me personally came _Rich Paul_ and acknowledged to me that he/she had executed the foregoing Agent Certification.

Notary Public

**GLORIA D. CAVANAUGH**
**NOTARY PUBLIC · STATE OF OHIO**
**Recorded in Cuyahoga County**
**My commission expires Sept. 15, 2018**

**COMMISSIONER**

SEP 1 1 2017

18

UNIFORM PLAYER CONTRACT
Exhibit 1 - Compensation

Player:      Nerlens Noel

Team:        Dallas Basketball Limited

Date:        June 23, 2017

| Season | Current Base Compensation | Deferred Base Compensation |
|--------|---------------------------|----------------------------|
| 2017-18 | S 4,187,599 | None |

Payment Schedule (if different from paragraph 3):   N/A

    Current Base:

    Deferred Base:

Signing Bonus (include dates of payment):  None

Incentive Compensation (include dates of payment):  None

Other Arrangements:  None

COMMISSIONER

SEP 1 1 2017

Adam Silver

Initialed:

NN
Player

DN
Team

App. 25

## UNIFORM PLAYER CONTRACT
### Exhibit 2 - Compensation Protection

Player:        Nerlens Noel

Team:        Dallas Basketball Limited

Date:        June 23, 2017

| Season | Type of Protection | Amount of Protection | Additional Conditions or Limitations |
|--------|--------------------|----------------------|--------------------------------------|
| 2017-18 | Lack of skill; injury or illness; | $ 4,187,599 | None |

**Automatic Stretch Provision:**  In the event that the Team terminates this Contract (resulting in the Player's separation of service from the Team), and the Team is obligated thereafter to make payments to the Player pursuant to this Exhibit 2, such payments shall be rescheduled as follows:  (i) if the request for waivers on the Player is made during the period from September 1 through the following June 30, then (x) the Base Compensation owed to the Player pursuant to this Exhibit 2 with respect to the Salary Cap Year in which the request for waivers is made shall be paid in accordance with the payment schedule set forth in this Contract; and (y) the remaining Base Compensation owed to the Player pursuant to this Exhibit 2 shall be aggregated and paid in equal amounts per Season over a period equal to twice the number of Seasons (including any Player Option Year) remaining on this Contract following the Salary Cap Year in which the request for waivers occurred (not including the then-current Season (or, in the case of requests for waivers made from September 1 through the first day of a Regular Season, the upcoming Season)), plus one Season; and (ii) if the request for waivers on the Player is made during the period from July 1 through August 31, then the remaining Base Compensation owed to the Player pursuant to this Exhibit 2 shall be aggregated and paid in equal amounts per Season over a period equal to twice the number of Seasons (including any Player Option Year) remaining on this Contract following the date of the waiver (including the upcoming Season), plus one Season.  In all circumstances described above except where specifically noted otherwise, the Base Compensation in each Season shall be paid in accordance with the schedule set forth in paragraph 3 of this Contract.



COMMISSIONER

SEP 1 1 2017

Initialed:

Player          Team

UNIFORM PLAYER CONTRACT
Exhibit 5 - Other Activities


Player:        Nerlens Noel

Team:          Dallas Basketball Limited

Date:          June 23, 2017


Notwithstanding the provisions of paragraph 12 of this Contract, the Player and the Team agree that the Player need not obtain the consent of the Team in order to engage in the activities set forth below:

1. To play, practice, demonstrate, or instruct basketball in connection with a basketball camp or clinic;

2. To play or practice in a game in connection with a basketball camp or clinic provided it is not an organized game and does not unreasonably endanger the Player's health or safety;

3. To participate in weight training, running and other individual and/or group conditioning exercises under the direction of a personal trainer; and

4. To participate in off-season basketball pick-up games which do not unreasonably endanger the Player's health or safety and which are not organized games or exhibitions where the score is kept and officials are present.

The Player and Team acknowledge that the foregoing list of activities for which the Player need not obtain the Team's consent shall not include any off-season basketball game for which admission is charged or for which the Player is to be compensated for his participation.



COMMISSIONER

SEP 1 1 2017

Initialed:

Player        Team

App. 27

## UNIFORM PLAYER CONTRACT
### Exhibit 6 – Physical Exam

Player:      Nerlens Noel

Team:       Dallas Basketball Limited

Date:        June 23, 2017


The Player and the Team agree that this Contract will be invalid and of no force and effect unless the Player passes, in the sole discretion of a physician designated by the Team, a physical examination in accordance with Article II, Section 12(h) of the CBA that is (i) conducted within three (3) business days of the execution of this Contract, and (ii) the results of which are reported by the Team to the Player within six (6) business days of the execution of this Contract. The Player agrees to supply complete and truthful information in connection with any such examinations.



COMMISSIONER

SEP 1 1 2017

Initialed:

Player          Team

UNIFORM PLAYER CONTRACT
Exhibit 7 – Substitution for UPC Paragraph 7(b)

Player:      Nerlens Noel

Team:        Dallas Basketball Limited

Date:        June 23, 2017

Paragraph 7(b) is hereby deleted and the following shall be substituted in place and instead thereof:

"7.    (b)  The Player agrees, notwithstanding any other provision of this Contract, that he will to the best of his ability maintain himself in physical condition sufficient to play skilled basketball at all times. If the Player, in the reasonable judgment of the physician designated for that purpose by the Team, is not in good physical condition at the date of his first scheduled game for the Team, or if, at the beginning of or during any Season, he fails to remain in good physical condition, in either event so as to render the Player unfit in the reasonable judgment of said physician to play skilled basketball, the Team shall have the right to suspend the Player for successive one-week periods until the Player, in the reasonable judgment of the Team's physician, is in good physical condition; provided, however, that at the end of each such one-week period of suspension, if the Team notifies the Player, orally or in writing, that in its reasonable judgment it believes the Player is still not in good physical condition, and if the Player so requests, then the Player shall be examined by a physician or physicians designated for such purpose by the President, or any Vice President if the President is not available, of the American Society of Orthopedic Physicians, or equivalent organization (the "Reviewing Physician"), whose sole judgment concerning the physical condition of the Player to play skilled basketball shall be binding upon the Team and the Player for purposes of this paragraph. The suspension of the Player shall be terminated promptly upon the failure of the Team to give the Player the notice required at the end of the one-week period or upon the finding of said Reviewing Physician that the Player is in physical condition sufficient to play skilled basketball. In the event of a suspension permitted hereunder, the Compensation (excluding any signing bonus or Incentive Compensation) payable to the Player for any Season during such suspension shall be reduced in the same proportion as the length of the period of disability so determined bears to the length of the Season. Nothing in this paragraph 7(b) shall authorize the Team to suspend the Player solely because the Player is injured or ill."



COMMISSIONER

SEP 1 1 2017

Initialed:

Player          Team