UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NERLENS NOEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-2485-B |
| | § | |
| RICHARD PAUL and KLUTCH | § | |
| SPORTS GROUP, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Richard Paul (Paul) and Klutch Sports Group, LLC (KSG)'s

Motion to Dismiss (Doc. 3). For the reasons explained below, the Court **GRANTS** the Motion.[1]

## I.

## BACKGROUND

A.    *Factual Background*

This is a dispute between a professional athlete and his former agent. Plaintiff Nerlens Noel

(Noel) is a professional basketball player in the National Basketball Association (NBA). Doc. 1-3,

Pet., 2. Defendant Paul is a sports agent who is the "founder, [chief executive officer (CEO)], and

Board Member of Defendant [KSG]," a sports agency. *Id.* at 3.

---

[1] Since Defendants filed the instant motion, Noel has filed two motions. The first asks the Court to strike the Declaration of Ronald Klempner, which was filed as a part of Defendants' Appendix in support of their Motion to Compel Arbitration. *See* Doc. 11, Pl.'s Mot. Strike. The second requests that the Court authorize jurisdictional discovery in the event that it finds that it lacks personal jurisdiction over Defendants. *See* Doc. 12, Pl.'s Mot. Disc. Because (1) the Court has not relied on Mr. Klempner's Declaration in deciding the instant motion; (2) the Court finds that all of Noel's claims should be compelled to arbitration or are otherwise rendered moot by this Order; and (3) the Court's disposition is not based on a lack of personal jurisdiction, Noel's Motions (Docs. 11 & 12) are **MOOT**.

Noel began his NBA career as a member of the Philadelphia 76ers after being selected in the first round of the 2013 NBA draft. *See id.* at 2. After three and a half years in Philadelphia, Noel was traded to the Dallas Mavericks during the middle of the 2016–17 NBA season. *Id.* at 2–3. Noel had a successful finish to the season with the Mavericks and became a restricted free agent the following summer. *Id.* When the NBA free agency period opened in July 2017, the Mavericks offered Noel a four-year contract worth $70 million. *Id.* Noel's agent at the time of the offer was Happy Walters (Walters). *Id.* at 3.

Around the time Noel received the Mavericks contract offer, Noel met Paul for the first time at a birthday party for a former teammate. *Id.* At the party, Noel claims that Paul "made a pitch to become Noel's agent." *Id.* at 4. The pitch consisted of Paul telling Noel that he "was a [$]100 million man" and that, if Noel fired Walters and hired Paul, Paul would get Noel a deal at the league maximum salary. *Id.* According to Noel, Paul also "advised Noel that he should cease negotiations with Dallas, accept [a] single year qualifying offer, and seek a max deal on the free agent market the following season." *Id.*

Paul's pitch was successful. The month after the party, Noel terminated his relationship with Walters and executed a Standard Player Agent Contract (the SPAC) with Paul. *Id.* "The SPAC is a standard form agreement used for all NBA player and agent contracts" that is drafted by the National Basketball Players Association (the NBPA), a union for NBA players. *Id.*; Doc. 4, Defs.' App., 42–44, 63. Shortly thereafter, Noel—on Paul's advice—accepted a one-year, $4.1 million contract to play for the Mavericks. Doc. 1-3, Pet., 4–5. In accordance with the SPAC, Paul "received a payment of 4% of the value of [Noel's] contract," compensation Paul would not have been entitled to had Noel accepted the long-term offer negotiated by Walters. *See id.* at 3–5.

When the next season began, things took a turn for the worse. In "December 2017, Noel tore a ligament in his thumb . . . [,] had surgery to repair the ligament[,] and was forced to miss 42 games." *Id.* at 5. After the season ended, Noel alleges that "Paul began to lose interest in [him] as a client." *Id.* "[N]either Paul nor anyone at [KSG] presented any real proposals to Noel in terms of strategies or ideas on how Noel might secure a long-term contract or even a significant contract for the following season," Noel claims. *Id.* As a result, Noel had "no real offers or deals" presented to him at the start of the 2018 free agency period, and he ultimately decided to join the Oklahoma City Thunder on a two-year, $3.75 million, league minimum deal with a player option for the second year that would allow him to test free agency again the following season. *Id.* at 5–6.

Noel played limited minutes for the Thunder during the 2018–19 season, during which time he avers that "neither Paul nor [KSG] made any effort to try and secure contracts or deals on [his] behalf." *Id.* at 6. When the season ended, Noel, on Paul's advice, declined his player option and once again became a free agent. *Id.* When free agency began that July, rumors had circulated in NBA circles that Noel was primed to sign a new, lucrative three-year deal with the Thunder. *Id.* Noel believes that the rumors were started by Paul, a KSG employee, or the Thunder. *Id.* Unfortunately, however, these rumors never materialized, and, after receiving no offers from other teams, Noel signed a one-year league minimum deal to return to the Thunder for the 2019–20 season. *Id.* Noel posits that the false rumors about the three-year offer from the Thunder caused other teams to shy away from pursuing him during free agency on the assumption that Noel's return to the Thunder was predetermined. *Id.*

Sometime thereafter, Noel learned from a former coach that the 76ers had been interested in signing him, but that "Paul did not take and/or return any of the calls from the 76ers." *Id.* at 7.

Noel "also learned that Paul was not returning or taking calls from other team representatives who were interested in signing Noel for their respective teams." *Id.* "Concerned about the lack of effort or results, Noel contemplated terminating his relationship with Paul sometime in January 2020," but decided not to after a KSG employee, Lucas Newton, "informed [him] that [KSG] had been talking to [the Thunder] on his behalf and that [they were] planning on offering Noel a three-year deal for between $7 and $10 million per year." *Id.* However, on the first night of free agency the following November, "Noel did not hear from a single team." *Id.* When Noel inquired about the Thunder's purportedly impending offer, Newton "advised [him] that the Oklahoma City deal was still in play and that they were just trying to move money around on the books to create cap space for the deal." *Id.* at 7–8.

For reasons not pleaded, the Oklahoma City offer/deal never came to fruition. Noel later learned that, during the free agency period, two other teams had each been "trying to contact Paul, but that Paul was not taking or returning those calls." *Id.* at 8. Noel ultimately signed a one-year, $5 million deal with the New York Knicks, which Noel claims was arranged only after the Knicks reached out to one of Noel's friends, who then connected the Knicks with Paul. *Id.* After years of frustration, things "came to a tilt in December 2020 when [Noel] learned that Paul had a history of mismanaging and ignoring" clients who were not deemed "marquee," "costing them significant money." *Id.* For this reason, "Noel . . . terminated his relationship with Paul and [KSG] on or around December 19, 2020." *Id.*

B.    *Procedural Background*

Sometime before this suit was filed, a payment dispute arose between Paul and Noel that provoked Paul to file a grievance against Noel, initiating the arbitration process provided for in the

SPAC. Doc. 3, Defs.' Mot., 1. Noel answered Paul's grievance, initiated his own in response, and then, on August 23, 2021, filed the instant lawsuit in Texas state court against Paul and KSG. *Id.* at 1–2; Doc. 1-3, Pet. Noel brings claims for breach of fiduciary duty, negligence and gross negligence, and breach of the duty of good faith and fair dealing against Paul and KSG. Doc. 1-3, Pet., 9–13. He also brings a claim for breach of the SPAC against Paul. *Id.* at 11. Additionally, Noel seeks a declaratory judgment stating that the arbitration procedure provided by the SPAC "is invalid, void, and unenforceable." *Id.* at 9.

Defendants timely removed the case to this Court and filed the pending Motion to Dismiss. *See* Doc. 1, Notice of Removal; Doc. 3, Defs.' Mot. Defendants contend that all of Noel's claims should be compelled to arbitration pursuant to the SPAC or should be dismissed for lack of personal jurisdiction. *See* Doc. 3, Defs.' Mot. The motion is fully briefed and ripe for review. The Court considers it below.

## II.

## LEGAL STANDARD

In enacting the Federal Arbitration Act ("FAA"), "Congress . . . expressed a strong policy favoring arbitration before litigation." *J.S. & H. Constr. Co. v. Richmond Cnty. Hosp. Auth.*, 473 F.2d 212, 214–15 (5th Cir. 1973). Under the FAA, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Fifth Circuit follows a two-step process to decide whether to compel arbitration. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "First, the court asks whether there is a valid agreement to arbitrate

and, second, whether the current dispute falls within the scope of a valid agreement." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 743 (5th Cir. 2018) (citing *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013)). "[The] analysis for both steps is governed by [state] law." *Gezu v. Charter Commc'ns*, 17 F.4th 547, 553 (5th Cir. 2021) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## III.

## ANALYSIS

Below, the Court first examines whether the parties have a valid, enforceable agreement to arbitrate. Finding that they do, the Court then considers whether the claims at issue fall within the scope of that agreement. The Court concludes that, except for Noel's declaratory judgment claim—which is rendered moot by the Court's analysis at the first step—all of Noel's claims fall within the scope of the arbitration agreement. Finally, because the Court finds that all non-moot claims must be compelled to arbitration, the Court determines that this case should be dismissed in its entirety.

A.    *Whether a Valid Agreement to Arbitrate Exists Between the Parties*

At the first step of its analysis, the Court must decide whether, under applicable state law, "there is *any* agreement to arbitrate *any* set of claims." *Kubala*, 830 F.3d at 202 (emphasis added); *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400–01 (5th Cir. 2022). Where, as here, a nonsignatory to an arbitration agreement seeks to compel arbitration, the Court must also determine whether the arbitration provision is enforceable by the nonsignatory under state law. *Newman*, 23 F.4th at 401.

Turning to the present case, the SPAC—which was signed by Noel and Paul—contains the

- 6 -

following arbitration clause:

> **7.**    **Arbitration: Resolution of All Disputes Arising Out of This Agreement**
> Any and all disputes between the Player and the Agent involving the meaning,
> interpretation, application, or enforcement of this Agreement or the obligations of
> the parties under this Agreement shall be resolved exclusively through the
> Arbitration procedure set forth in Section 5 of the NBPA Regulations Governing
> Player Agents. As provided in Section 5(D) of those Regulations, if any arbitration
> hearing takes place, the NBPA may participate and present, by testimony or
> otherwise, any evidence relevant to the dispute. Because of the uniquely internal
> nature of any such dispute that may arise under this Agreement, the Player and the
> Agent agree that the arbitrator's award shall constitute a final and binding resolution
> of the dispute and neither party will seek judicial review on any ground.

Doc. 4, Defs.' App., 7. Noel does not dispute that he voluntarily entered the SPAC or that the SPAC

contains an arbitration clause. *See* Doc. 9, Pl.'s Resp. He does, however, challenge the arbitration

clause's enforceability in two ways. First, Noel contends that the language from the arbitration clause

adopting "the [a]rbitration procedure set forth in Section 5 of the NBPA Regulations Governing

Player Agents," Doc. 4, Defs.' App., 7, is illegal under Texas and New York law, meaning that the

arbitration clause should be invalidated or the challenged procedure should be severed. Doc. 9, Pl.'s

Resp., 11–15. Second, Noel urges that KSG, as a nonsignatory to the SPAC, cannot enforce the

arbitration provision to require him to arbitrate his claims against it.[2] *Id.* at 17–19. The Court

addresses each challenge below after first determining which state law governs its inquiry.

    1.    Choice of Law

       As a threshold matter, the parties dispute which state's contract law applies to the Court's

analysis. Defendants argue that New York law applies because the SPAC states that it is governed

---

[2] Noel frames this argument as challenging whether his claims against KSG fall within the scope of
the arbitration agreement. *See* Doc. 9, Pl.'s Resp., 16–19. The Court instead considers Noel's challenge as
one targeted at the enforceability of the SPAC's arbitration provision, which the Fifth Circuit has explained
is properly addressed at the first step of the analysis. *See Newman*, 23 F.4th at 401.

by New York law. Doc. 3, Defs.' Mot., 12 & n.2 (citing Doc. 4, Defs.' App., 8). Noel contends that Texas law applies because New York "had absolutely no relationship to the services performed under the SPAC." Doc. 9, Pl.'s Resp., 12 n.5. He further argues that, even if the choice-of-law clause was enforceable, it would still not supply the law determining the enforceability of the arbitration clause because the arbitration clause is severable from the SPAC. *Id.* at 8 n.4.

When sitting in diversity jurisdiction, federal courts apply the choice-of-law rules of the forum state—here, Texas. *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "[W]hile they are not unassailable, [the] default position [in Texas] is that choice-of-law provisions should be enforced." *3D/Int'l, Inc. v. Romano*, 811 F. App'x 244, 248 (5th Cir. 2020) (citing *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580–81 (5th Cir. 2015)). A party may render a choice-of-law provision unenforceable by satisfying the standards of either subsection (a) or (b) of Section 187(2) of the Restatement (Second) of Conflicts of Laws (the Restatement). *Cardoni*, 805 F.3d at 581. Noel challenges the SPAC's choice-of-law clause under § 187(2)(a).[3] *See* Doc. 9, Pl.'s Resp., 12 n.5.

Section 187(2)(a) provides that a choice-of-law provision controls unless the challenging party shows that "the chosen state has no substantial relationship to the parties or the transaction

---

[3] To invalidate a choice-of-law provision under § 187(2)(b), Plaintiff was required to show that another state: "(1) has a more significant relationship with the parties and the transaction at issue than the chosen state; (2) has a materially greater interest than the chosen state in the enforceability of the provision at issue; *and* (3) has a fundamental policy that would be contravened if the chosen state's law is applied." *3D/Int'l, Inc.*, 811 F. App'x at 248–49 (citing *Cardoni*, 805 F.3d at 582). Plaintiff has not attempted to establish these elements, which is alone reason enough to uphold the choice-of-law provision under § 187(2)(b). *See id.* at 248 ("[The] default position [in Texas] is that choice-of-law provisions should be enforced." (citing *Cardoni*, 805 F.3d at 580–81)); *O'Connor v. Cory*, 2018 WL 5117197, at *10 (N.D. Tex. Oct. 19, 2018) (enforcing a choice-of-law clause where the party seeking to invalidate it "ha[d] not met its burden of showing why the . . . clause should not be enforced").

and there is no other reasonable basis for the parties' choice." *Cardoni*, 805 F.3d at 581 (quoting Restatement (Second) of Conflict of Laws § 187(2)(a)). Noel asserts that "New York had absolutely no relationship to the services performed under the SPAC (aside from Plaintiff playing a handful of games there during the season)," and that "[t]he only relationship New York had at that time was that it was the headquarters of the . . . NBPA." Doc. 9, Pl.'s Resp., 12 n.5. But this last admission forecloses Noel's argument under § 187(2)(a).

Defendants have argued—and Noel has not disputed—that the NBPA works on behalf of NBA Players (including Noel) to, among other things, draft the SPAC. Doc. 3, Defs.' Mot., 1, 6. *See generally* Doc. 4, Defs.' App., 40–46, 64–66 (discussing the NBPA's role in negotiating on behalf of NBA players and setting forth standards governing the SPAC). Indeed, the SPAC itself contains a number of provisions exemplifying the NBPA's heavy involvement. For example, the SPAC: (1) provides that it "[was] entered into pursuant to and in accordance with the . . . NBPA . . . Regulations Governing Player Agents"; (2) requires that Paul have "familiarized himself with the Regulations and [have] applied for and been certified as a Player Agent by the NBPA" prior to its execution; (3) states that "in performing . . . services [under the SPAC,] the Agent is the NBPA's delegated representative"; (4) bases agent compensation on player salary amounts set forth in the NBA–NBPA collective bargaining agreement; (5) automatically terminates if "the Agent's certification is suspended or revoked by the NBPA or the Agent is otherwise prohibited by the NBPA from performing the services he has agreed to perform"; (6) allows for changes or amendments "only to the extent that they are consistent with the Standard Form Agreement approved by the NBPA"; and (7) required that a copy of the SPAC "be promptly delivered to the NBPA Committee on Agent Regulation within five (5) days of its execution." Doc. 4, Defs.' App., 5–8. At the very minimum,

- 9 -

these circumstances demonstrate that the NBPA's relationship to Noel and to the SPAC is such that the parties had a reasonable basis for selecting New York law to govern the SPAC. *See Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014). As such, the Court finds that the SPAC's New York choice-of-law provision is enforceable.

Noel suggests, citing to *Micheletti v. Uber Techs., Inc.*, 213 F. Supp. 3d 839, 846 (W.D. Tex. 2016) for support, that the SPAC's choice-of-law provision, even if valid, does not control the state law governing the Court's determination of gateway issues regarding the enforceability of the arbitration clause. *See* Doc. 9, Pl.'s Resp., 8 n.4. In *Micheletti*, the court considered whether a choice-of-law provision contained in a contract determined the validity of a delegation provision of an arbitration clause contained in the same agreement. *See* 213 F. Supp. 3d at 846–47. In considering the issue, the *Micheletti* court first noted that arbitration clauses are severable from the contract in which they are found and delegation provisions are further severable from the arbitration agreements to which they apply. *See id.* at 846–47. Then, reasoning that neither the arbitration clause nor the delegation provision at issue contained separate choice-of-law clauses, and that the arbitration clause included language stating: "This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement[,]" the court concluded that the contract's general choice-of-law clause "ha[d] no effect on [its] determination of the enforceability of the delegation provision." *Id.* at 846–47.

The Court finds *Micheletti* inapposite. First, unlike the arbitration clause at issue in *Micheletti*, the SPAC's arbitration clause contains no "merger" language suggesting that it is "the full and complete agreement" regarding arbitration; in fact, the SPAC's incorporation of the arbitration procedures laid out in the NBPA Regulations suggests just the opposite. *See* Doc. 4, Defs.' App., 7;

*cf. Micheletti*, 213 F. Supp. 3d at 846. Second, to the extent *Micheletti* can be read to suggest that choice-of-law provisions governing contracts do not apply to arbitration clauses contained therein, the Fifth Circuit appears to disagree. Indeed, the Fifth Circuit has, on several occasions, analyzed the validity and enforceability of arbitration clauses using the law selected by a choice-of-law provision in the general contract. *See, e.g.*, *In re Willis*, 944 F.3d 577, 580 & n.4 (5th Cir. 2019); *Edwards*, 888 F.3d at 745; *Overstreet v. Contigroup Cos.*, 462 F.3d 409, 411 (5th Cir. 2006). And while the Fifth Circuit did note in some of these cases that the validity of the relevant choice-of-law clause was not disputed, that distinction could only be relevant if each contract's general choice-of-law clause was presumed to apply to those disputes about the applicability and enforceability of the arbitration clause. Thus, the Court concludes that it is bound to apply New York law to resolve gateway issues regarding the enforceability of the SPAC's arbitration clause.

> 2.     Whether the 30-Day Grievance Filing Period Invalidates the SPAC's Arbitration Clause

Having determined that New York law applies, the Court now turns to Noel's argument challenging the arbitration procedure provided for by the SPAC. Specifically, Noel challenges the grievance-filing limitation period (the 30-day limitation) incorporated into the SPAC though the NBPA Regulations:

> The arbitration of a dispute . . . shall be initiated by the filing of a written grievance either by the Player or the Player Agent.
>
> Any such grievance must be filed within thirty (30) days from the date of the occurrence of the event upon which the grievance is based or within thirty (30) days from the date on which the facts of the matter become known or reasonably should have become known to the grievant or within thirty (30) days from the effective date of these Regulations, whichever is later.

Doc. 4, Defs.' App., 7, 69; Doc. 9, Pl.'s Resp., 11–15.

- 11 -

The Court first considers whether it has the authority to determine the enforceability of the 30-day limitation in considering Defendants' request to compel arbitration. Concluding that it does, the Court then proceeds to analyze the limitation under New York law.

         *i.*      *Arbitrability of the 30-day limitation period*

To begin, the Court finds that it has the authority to determine whether the 30-day limitation is enforceable. Generally, "a gateway dispute about whether . . . parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (first citing *First Options*, 514 U.S. at 943–46); and then citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47 (1964)). However, "'"procedural" questions which grow out of [a] dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide." *Id.* (quoting *John Wiley*, 376 U.S. at 557). For this reason, whether "time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrator[] to decide." *See id.* at 85 (emphasis omitted).

In the present case, the narrow issue before the Court is whether the 30-day limitation provided for by the SPAC is enforceable—*not* whether Noel complied with it. As such, Noel's challenge as to the enforceability of the 30-day limitation is a "gateway dispute" properly determined by the Court. *See Castellanos v. Raymours Furniture Co.*, 291 F. Supp. 3d 294, 298 (E.D.N.Y. 2018) (finding that the enforceability of a limitations period set forth in an arbitration agreement was a question for the court); *Crespo v. Kapnisis*, 2022 WL 2916033, at *6 (E.D.N.Y. July 23, 2022) (collecting cases where courts have disallowed arbitration provisions shortening the limitations period); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of

the parties' arbitration agreement *nor . . .* its enforceability or applicability to the dispute is in issue."); *Smith v. Xlibris Publ'g*, 2016 WL 5678566, at *4 (E.D.N.Y. Sept. 30, 2016) (ruling on the parties' dispute about whether an "opt out" provision of an arbitration clause was unconscionable).

It is somewhat unclear whether Defendants disagree with the Court's conclusion on this point. On the one hand, Defendants' briefing on the issue, at least in sections devoted to the enforceability of the SPAC's arbitration provision, argues only that the 30-day limitation is valid. *See* Doc. 13, Defs.' Reply, 1–5. On the other hand, Defendants have also argued that Noel's declaratory judgment claim—which simply asks that the Court decide the enforceability of the 30-day limitation in his favor—is arbitrable as a claim "regarding the 'interpretation, application, or enforcement of [the SPAC].'" *Id.* at 6 (alteration in original) (quoting Doc. 4, Defs.' App., 7). As such, the Court deems it appropriate to discuss whether the SPAC delegates the question of the enforceability of the 30-day limitation to the arbitrator. It does not.

Because, as explained above, the enforceability of the 30-day limitation is a gateway question for the Court, it presumes that the parties have *not* authorized it to be resolved by an arbitrator. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019). As such, Defendants "bear[] the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question[.]" *Hous. Refin., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 765 F.3d 396, 408 (5th Cir. 2014). "[S]ilence or ambiguity" in the agreement are insufficient. *Lamps Plus, Inc.*, 139 S. Ct. at 1417 (reasoning that permitting gateway issues to be determined by silence or ambiguity "might . . . force [an] unwilling part[y] to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide").

Here, Defendants have conceded that "there is no delegation provision in the SPAC arbitration provision or in the NBPA Agent Regulations." Doc. 13, Defs.' Reply, 2. And to the extent that Defendants believe that the broadness of the SPAC's arbitration clause inherently encompasses gateway questions of arbitrability, *see id.* at 6, the Court disagrees. The arbitration clause itself is silent or ambiguous on the issue, and therefore does not "clearly and unmistakably" demonstrate that the parties agreed to have an arbitrator decide the issue. *See* Doc. 4, App., 7; *Lamps Plus, Inc.*, 139 S. Ct. at 1417. Thus, because the Defendants have failed to carry their burden, the Court will decide the enforceability of the thirty-day limitation "just as it would decide any other question that the parties did not submit to arbitration, namely, independently." *Hous. Ref., L.P.*, 765 F.3d at 408 (quoting *ConocoPhillips, Inc. v. Loc. 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014)).

ii.     *The 30-day limitation is enforceable under New York law*

Its authority to decide the issue established, the Court now considers whether the 30-day limitation is enforceable and, if not, what effect that has on the SPAC's arbitration clause. Noel argues that New York law "recognize[s] that a provision in a contract may validly limit the time for bringing an action . . . to a period less than that prescribed in the general statute of limitations, . . . only if the shortened period prescribed by contract is reasonable." Doc. 9, Pl.'s Resp., 13 (citing *USA United Holdings, Inc. v. Tse-Peo, Inc.*, 2009 WL 1099462 (N.Y. Sup. Ct. Apr. 23, 2009)). Defendants set forth a different standard. Defendants argue that Noel's challenge is essentially "that the arbitration provision in the SPAC is unconscionable," and therefore he must show that the arbitration agreement is both procedurally and substantively unconscionable under New York law. Doc. 13, Defs.' Reply, 3.

- 14 -

The Court disagrees with Defendants' construction of Noel's argument. "Under New York law, the parties to a contract may agree on a shortened time period for bringing claims." *In re Kingate Mgmt. Ltd. Litig.*, 2016 WL 5339538, at *33 n.35 (S.D.N.Y. Sept. 21, 2016) (citing N.Y. C.P.L.R. § 201 (McKinney 2022)). And "[a]bsent proof that the contract is one of adhesion or the product of overreaching, or that the altered period is unreasonably short, the abbreviated period of limitation will be enforced." *Id.* (quoting *John v. State Farm Mut. Auto Ins. Co.*, 983 N.Y.S.2d 883, 884 (N.Y. App. Div. 2014)). Here, Noel has argued that the 30-day limitation is unreasonably short under New York law, and therefore, that enforcing the SPAC's arbitration clause—at least to the extent that it incorporates the 30-day limitation—would violate New York law. *See* Doc. 9, Pl.'s Resp., 13. The Court views this as a separate inquiry from unconscionability and therefore analyzes it separately. *Cf. Mill-Bern Assocs. v. Int'l Bus. Machs. Corp.*, 2001 WL 1352468, at *4, *6 (S.D.N.Y. Nov. 1, 2001) (examining the reasonableness of a contractual limitation period before analyzing whether a separate contractual provision was unconscionable).

To determine whether a contractually shortened limitations period is reasonable, New York courts examine whether "[t]he period of time within which an action must be brought . . . [is] fair and reasonable[] in view of the circumstances of each particular case." *Exec. Plaza, LLC v. Peerless Ins. Co.*, 5 N.E.3d 989, 992 (N.Y. 2014) (quoting *Continental Leather Co. v. Liverpool, Brazil & River Plate Steam Navigation Co.*, 259 N.Y. 621 (N.Y. 1932) (Crane, J., dissenting)). Importantly, it is "[t]he circumstances, not the time, [that is] the determining factor." *Id.* Noel argues that, "if the 30-Day Provision is applied, [he] would have been barred from any relief unless he discovered Defendants' wrongful conduct and the extent of his injuries and brought a claim for relief in a matter of days." Doc. 9, Pl.'s Resp., 15. Given the facts of this case, Noel continues, it would "be

- 15 -

[un]reasonable for him to even realize the nature of all of the wrongs that were perpetrated against him in that time." *Id.* Specifically, Noel emphasizes that "it was not until August of 2021 that [he] was able to fully realize his market potential, and thus Paul's monumental failures as an agent." *Id.*

As a starting point, the Court notes that the 30-day limitation provides that it begins to run *on the later of* three dates, one of which is "the date on which the facts of the matter become known or reasonably should have become known to the grievant." *See* Doc. 4, App., 7, 69. Thus, Noel's reading of the 30-day limitation is overly restrictive. Moreover, to the extent that Noel claims that it would be unreasonable to require him to have filed a grievance concerning the claims at issue in this suit any earlier than he did, that argument is one regarding Noel's *compliance with* the 30-day limitation—a question reserved for the arbitrator. *Howsam*, 537 U.S. at 85. With this foundation set, the Court proceeds to consider the enforceability of the 30-day limitation.

The Court finds that the 30-day limitation is not unreasonable under the circumstances of this case. Noel cites four cases in support of his proposition that a contractual limitations period of thirty days violates New York law: *David Tunick, Inc. v. Kornfeld*, 813 F. Supp. 988 (S.D.N.Y. Feb. 2, 1993); *Fitzpatrick & Weller, Inc. v. Miller*, 765 N.Y.S.2d 555 (N.Y. App. Div. 2003); *Spataro v. Hirschhorn*, 837 N.Y.S.2d 258 (N.Y. App. Div. 2007); and *USA United Holdings*, 2009 WL 1099462. *See* Doc. 9, Pl.'s Resp., 13. Each is distinguishable.

*Kornfeld* concerned a 4-week limitations period. *See* 813 F. Supp. at 993. The court, without opining on the length of the limitations period, found that it was not controlling "[b]ecause there exist[ed] ambiguity as to the applicability and proper construction" of the limitations period. *Id.* at 993–94. Noel has not made a similar challenge regarding the 30-day limitation at issue in this case. *See* Doc. 9, Pl.'s Resp.

- 16 -

*Fitzpatrick & Weller* concerned a contract dispute between a sawmill and its lumber supplier. *See* 765 N.Y.S.2d at 555. Under governing rules and regulations, the sawmill was required "to report any difference between the amount of the seller's invoice and the value of the shipment computed from the buyer's measurement and inspection within 14 days after unloading." *Id.* at 556. The *Fitzpatrick & Weller* court rejected that this rule established a contractual limitations period, and opined that, even if it did, the 14-day period would be "unreasonably short." *Id.* Similarly, the court in *Spataro* found that a limitations provision requiring that "a demand for arbitration be made 'in writing, within twenty (20) days after a dispute has arisen,'" was unreasonably short, not clear and unambiguous, and thus unenforceable. 837 N.Y.S.2d at 259. But the 30-day limitation at issue in the present case, unlike the ones in *Fitzpatrick & Weller* and *Spataro*, does not begin until at least the date Noel knew or should have know of the facts giving rise to his claim. *See* Doc. 4, Defs.' App., 7. Because the 30-day limitation period is triggered only once Noel reasonably should have had knowledge of the facts underlying his claim, there is no risk that Noel's claims will have extinguished before he has the reasonable opportunity to assert them. *Cf. Exec. Plaza*, 5 N.E.3d at 992.

In *USA United Holdings*, a plaintiff bus company sued its tax advisors, alleging they mishandled its taxes. 2009 WL 1099462, at *1–2. Per the parties' agreement, the plaintiff was required to "file an action within 60 days after becoming aware that a . . . cause of action had arisen." *Id.* at *8 n.7. Relevant here is that, long before the suit was filed, the plaintiff was given notice of various tax liens which, according to the defendants, triggered the 60-day suit filing period. *Id.* at *6. The court disagreed for a number of reasons, one being that "the time limitation was unreasonable in light of the circumstances under which the contract was to be performed." *Id.* at *7. In particular, the court highlighted the "nature of the services to be supplied under the contract and the ongoing

nature of the relationship, during which [the] defendants . . . made submissions to . . . various government agencies on the plaintiff's behalf" to attempt to resolve the tax issues that formed the basis of the plaintiff's lawsuit. *Id.*

Here, like in *USA United Holdings*, the nature of Noel's relationship with Defendants was ongoing. *See id.*; Doc. 1-3, Pet., 4–8 (describing tortious conduct occurring over a three-year period). But the similarities end there. Unlike in *USA United Holdings*, the 30-day limitation and the SPAC itself were both the subject of collective bargaining between two sophisticated parties, and each was drafted by the NBPA—an organization tasked with representing Noel's interests. *See* Defs.' App., 41–44; *Cf. MPI Tech A/S v. Int'l Bus. Machs. Corp.*, 2017 WL 481444, at *5 (N.Y.S.D. Feb. 6, 2017) (noting that the agreement at issue was "negotiated . . . between sophisticated business entities"). Further distinguishing the cases is that Defendants' continued representation of Noel was not capable of remedying past damages. While a successful appeal of the tax issues central to *USA United Holdings* would alleviate the plaintiff's issues with the defendants, *see USA United Holdings*, 2009 WL 1099462, at *7, Noel's damages for loss of earnings were cemented once incurred. Put differently, there is nothing before the Court to indicate that Noel reasonably expected that damages incurred by Defendants' allegedly inept representation of him were capable of being cured by Defendants' continued representation. With each contract he signed during the parties' relationship, Noel knew that he was making less than the offer he declined from the Mavericks (roughly $17.5 million per year) and that he would not be able to recoup those lost earnings.[4] Thus, the circumstances of Noel's situation, as alleged, are not analogous to that of the *USA United Holdings* plaintiff—which was in

---

[4] Of course, Noel hoped that Defendants would eventually be able to procure him the "max deal" Paul promised. *See* Doc. 1-3, Pet., 10. But even if they had, this future money would be compensation for Noel's future performance—not compensation remedying Noel's past damages.

the unique position of not knowing whether its damages were concrete. *See United Holdings*, 2009 WL 1099462, at *7. So, while the arbitrator may ultimately decide (assuming the issue is raised) that Noel complied with the thirty-day limitation because he was reasonably unaware of the facts giving rise to his grievance less than 30 days before he filed his grievance, the Court is unconvinced that the 30-day limitation is per se unreasonable in light of the circumstances of this case.[5] *Wayne Drilling & Blasting v. Felix Indus., Inc.*, 514 N.Y.S.2d 114, 115 (N.Y. App. Div. 1987); *Inc. Vill. of Saltair v. Zagata*, 720 N.Y.S.2d 200, 201 (N.Y. App. Div. 2001).

    3.    <u>Whether KSG Can Enforce the SPAC's Arbitration Provision</u>

The Court now turns to Noel's argument that KSG, as a nonsignatory, should not be permitted to enforce the SPAC's arbitration provision. Doc. 9, Pl.'s Resp., 17–18.

"[U]nder the FAA, traditional principles of state law may allow an arbitration contract to be enforced by or against nonparties to the contract through a number of state-contract-law theories, including equitable estoppel." *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)) (applying Arizona equitable estoppel doctrine to compel arbitration of the signatory-plaintiffs' claims against non-signatory-defendants). Accordingly, the question presented is whether New York law would permit KSG to enforce the SPAC's arbitration agreement against Noel.[6] *See id.*

---

[5] Even were the 30-day limitation unenforceable, the proper remedy would be to sever it from the arbitration clause and compel the parties to arbitration. *See Castellanos*, 291 F. Supp. 3d at 301–02.

[6] The parties briefed this issue by citation to Second Circuit cases which appear to have applied federal common law—not New York state law. *See* Doc. 9, Pl.'s Resp., 17–18; Doc. 13, Defs.' Reply, 7–8; *Doe v. Trump Corp.*, 6 F.4th 400, 412 (2d Cir. 2021) (referring to its precedent on the issue as "Second Circuit law"); *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 405–06 (5th Cir. 2022) (noting the ambiguity regarding which law the Second Circuit has applied). Nonetheless, New York state courts appear to have adopted the Second Circuit's precedent. *Denobile v. Panetta*, 89 N.Y.S.3d 98, 100 (N.Y. App. Div. 2018) (citing Second Circuit precedent for its conclusion that a signatory to an arbitration agreement was estopped

"Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Ragone v. Atl. Video*, 595 F.3d 115, 126–27 (2d Cir. 2010) (alteration in original) (quoting *Choctaw Generation L.P. v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). "[I]n addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id.* at 127 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)).

Defendants contend that KSG, though a non-signatory, may enforce the SPAC's arbitration provisions because Noel is estopped from preventing arbitration of his dispute with KSG because his claims against KSG are intertwined with the SPAC. Doc. 3, Def.'s Mot., 15–16. Defendants place Noel's claims against KSG into two buckets: (1) those grounded in the argument "that KSG owed the same duties and obligations to Noel as Paul by virtue of the SPAC and Paul's relationship with KSG"; and (2) those asserting "that KSG conspired with or aided Paul in breaching the duties he owed to Noel under the SPAC." *Id.* at 16. According to Defendants, both sets of claims are

---

from avoiding arbitration with a nonsignatory); *Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 895 N.Y.S.2d 698, 702–03 (N.Y. Sup. Ct. 2010) (same); *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Sup. Ct. 2005) (same). For this reason, and because any distinction between Second Circuit law and New York law on this issue is "insignificant," *Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.*, 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012), the Court proceeds by citation to Second Circuit caselaw. *Cf. Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 758 n.4 (S.D.N.Y. 2019).

necessarily intertwined with Noel's claims against Paul, meeting the estoppel test. *Id.* Noel concedes that his claims against Paul and KSG are related but contends that they "are not so integrally intertwined to justify equitable estoppel allowing [KSG] to compel arbitration." Doc. 9, Pl.'s Resp., 18.

The Court agrees with Defendants that Noel is estopped from avoiding arbitration of his claims against KSG. First, Noel's claims against KSG are clearly factually intertwined with his claims against Paul. A review of Noel's Petition shows that Noel seeks to hold KSG jointly and severally liable with Paul for breaches of obligations that ultimately derive from the SPAC. *See* Doc. 1-3, Pet., 3–9. Tellingly, Noel's Petition makes no effort to distinguish the source of KSG's obligations to Noel from the source of Paul's obligations to Noel, despite Noel's assertion made in his Response that he "is not a party to any agreement with [KSG]." Doc. 9, Pl.'s Resp., 1; *see* Doc. 1-3, Pet., 3–9 (describing only the origin of Paul's relationship with Noel through the SPAC before alleging tortious conduct attributable to KSG). Nor does Noel's Petition convincingly attempt to distinguish KSG's allegedly tortious conduct from Paul's. *See* Doc. 1-3, Pet., 3–9. With a single exception,[7] every allegation of tortious conduct attributable to KSG is found in a sentence claiming that KSG *and/or* Paul committed some act or omission. *See id.* "[Noel] cannot now escape the consequences of those allegations by arguing that' . . . [his] claims . . . against [KSG] are unrelated." *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *17 (S.D.N.Y. Sept. 16, 2020). Rather, a realistic view of Noel's

---

[7] The sole allegation of tortious conduct independently attributable to KSG is that a representative for KSG made misrepresentations to Noel in an effort to dissuade Noel from terminating his relationship with Paul. Doc. 1-3, Pet., 7–8. Stated differently, Noel has alleged that KSG tortiously prevented him from terminating the SPAC. *See id.* Given that this allegation is inherently linked to the SPAC, the Court is unconvinced that it is renders Noel's claims against KSG severable from his claims against Paul.

Petition reveals that Noel's claims against KSG are "bound up" with his claims against Paul, which arise from the SPAC. *See Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005).

Second, the relationship among the parties involved is sufficiently close to warrant application of the estoppel doctrine. As KSG's "founder, CEO, and Board Member," Paul maintains a close relationship to KSG. *See* Doc. 1-3, Pet., 3. Noel's Petition further makes clear that Noel considered both Paul and KSG to be his agent. *See id.* at 6 (referring to both Paul and KSG's alleged failures in representing him), 10 (referring to Paul's alleged promises made if Noel "hired Paul (and [KSG]) as his agent"), 12 (referring to both Paul and KSG as Noel's agents). Moreover, as Defendants point out, the NBPA's Agent Regulations—which are expressly incorporated by the SPAC—specifically provide that "[c]onduct by an employee or associate of a Player Agent that would violate these Regulations shall be deemed to be conduct of the Player Agent[.]" Doc. 13, Defs.' Reply, 7 n.5 (quoting Doc. 4., Defs.' App., 58). Under these circumstances, the Court is satisfied that "the relationship among the parties [is] of a nature that justifies a conclusion that [Noel] . . . should be estopped from" avoiding arbitration of his claims against KSG. *See Ragone*, 595 F.3d at 127.

In sum, the Court has determined that a valid, enforceable agreement to arbitrate exists between the parties. Therefore, the first step of the Court's analysis is complete and it next considers whether the claims in question fall within the scope of SPAC's arbitration clause.

B.    *Whether the Claims in Question Fall Within the Scope of the Agreement*

      1.    <u>Noel's Claims for Breach of Contract, Breach of Fiduciary Duty, Negligence, and Breach of the Duties of Good Faith and Fair Dealing</u>

Noel contends that his claims "for breach of fiduciary duty, negligence, and breach of the duties of good faith and fair dealing fall outside the scope of the arbitration provision."[8] Doc. 9, Pl.'s Resp., 17. These claims, Noel avers, "are premised on facts outside of the limited ambit of the 'meaning, interpretation, or enforcement' of the SPAC and [instead] focus on the validity and enforceability of a provision of the NBPA Regulations." *Id.* Because the SPAC did "not define the fiduciary duties owed by Paul to Plaintiff" and because Paul maintained fiduciary duties to Noel independent of the SPAC, Noel concludes that his claims fall outside the scope of the arbitration agreement. *Id.* The Court disagrees.

"When deciding whether a claim falls within the scope of an arbitration agreement, courts 'focus on factual allegations in the complaint rather than the legal causes of action asserted.'" *Jones v. Halliburton Co.*, 583 F.3d 228, 235 (5th Cir. 2009) (quoting *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 344 (5th Cir. 2004)). Although the analysis is governed by state law, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *New Orleans Glass Co. v. Roy Anderson Corp.*, 632 F. App'x 166, 169 (5th Cir. 2015) (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)); *Klein*, 710 F.3d at 236–37.

New York law recognizes that arbitration clauses can either be broad or narrow. *See Gerling Glob. Reinsurance Corp. v. Home Ins. Co.*, 752 N.Y.S.2d 611, 618 (N.Y. App. Div. 2002). Broad arbitration clauses create "a presumption of arbitrability," while narrow arbitration clauses require arbitration of only a subset of disputes, and collateral matters generally fall outside their purview. *Id.*

---

[8] Noel does not appear to dispute that his claim against Paul for breach of contract falls within the scope of the SPAC's arbitration provision. *See* Doc. 9, Pl.'s Resp., 16–17.

(quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)). "Regardless of whether a clause is broad or narrow, arbitration is strongly favored under New York law and any doubts about whether an issue is arbitrable should be resolved in favor of arbitration." *Murchison Cap. Partners, L.P. v. Nuance Commc'ns. Inc.*, 625 F. App'x 617, 625 (5th Cir. 2015) (first citing *Louis Dreyfus Negoce*, 252 F.3d at 223; and then citing *Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 889–90 (N.Y. 1997)) (applying New York law).

"Where the parties have agreed generally to submit to arbitration of all disputes arising out of the contract or any dispute relating to the meaning and interpretation of the underlying agreement, they have adopted a broad arbitration clause." *Id.* (quoting *Info. Scis., Inc. v. Mohawk Data Sci. Corp.*, 374 N.E.2d 624, 625 (N.Y. 1978) (per curiam)). Such is the case here, as the SPAC provides for arbitration of "[a]ny and all disputes . . . involving the meaning, interpretation, application, or enforcement of this Agreement or the obligations of the parties under this Agreement." Doc. 4, Defs.' App., 7.

Once a broad arbitration clause is identified, New York courts ask only "whether there is 'a reasonable relationship between the subject matter of the dispute and the general subject matter of the underlying contract.'" *Domansky v. Little*, 770 N.Y.S.2d 288, 289–90 (N.Y. App. Div. 2003) (quoting *Nationwide Gen. Ins. Co. v. Inv. Ins. Co. of Am.*, 332 N.E. 2d 333 (1975)); *White Rock Ins. Co. v. Lloyd's Syndicate 4242*, 163 N.Y.S.3d 505, 508 (N.Y. App. Div. 2022). Noel's claims for breach of fiduciary duty, negligence, and breach of the duties of good faith and fair dealing easily satisfy this test. Each claim boils down to Noel's general complaint that Paul and KSG breached obligations or duties owed to Noel as a result of the player-agent relationship that was created by the SPAC. *See* Doc. 1-3, Pet., 3–9. Noel cannot avoid the breadth of the SPAC's arbitration clause simply because

the allegedly breached duties that underly his claims can be sourced from both the SPAC and common law.[9] Accordingly, the Court finds that Noel's claims for breach of contract, breach of fiduciary duty, negligence, and breach of the duties of good faith and fair dealing each fall within the scope of the SPAC's arbitration clause.

### 2.    Noel's Declaratory Judgment Claim

As previously noted, Noel's declaratory judgment claim asks the Court to issue a declaratory judgment that the 30-day limitation is unenforceable. Doc. 1-3, Pet., 9. Because it found that question was a gateway issue properly reserved for the courts, the Court considered the merits of Noel's argument in considering Defendants' request to compel arbitration of Noel's claims. *See supra* Section III(A)(2)(ii). The question remains, however, whether the Court's determination of that issue in Defendants' favor renders Noel's declaratory judgment claim moot. The Court finds that it does.

The Fifth Circuit has recognized that a claim for declaratory judgment "can be mooted by subsequent developments." *Haggard v. Bank of the Ozarks, Inc.*, 547 F. App'x 616, 620 (5th Cir. 2013). To determine whether a claim for a declaratory judgment is moot, courts consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a

---

[9] Noel's claims would be covered by the SPAC's arbitration clause even were the Court to construe it narrowly. As Defendants correctly identify, the SPAC's arbitration clause covers "[a]ny and all disputes between the Player and the Agent involving the meaning, interpretation, application, or enforcement of [the SPAC] *or the obligations of the parties* under [the SPAC]." Doc. 13, Defs.' Reply, 6 (citing Doc. 4, Defs.' App., 7). Further, the SPAC provides that it was "entered into pursuant to and in accordance with the [NBPA] Regulations Governing Player Agents," which in turn contain detailed provisions defining and describing the obligations owed to players by their agents. *See* Doc. 4, Defs.' App., 5, 54–62. Thus, Noel's claims—which all rely on either the SPAC or professional duties arising from the SPAC—would fall within the express terms of the arbitration clause.

declaratory judgment." *Fla. Bd. of Bus. Reg. v. NLRB*, 605 F.2d 916, 918 (5th Cir. 1979). For example, a declaratory judgment claim is moot when the party seeking the declaratory judgment has obtained the relief it sought. *See Haggard*, 547 F. App'x at 620. Here, because the Court decided, as a gateway issue, that the SPAC's arbitration grievance filing period is enforceable under New York law, it has necessarily considered and denied Noel the relief sought in his declaratory judgment claim. As such, the Court finds that Noel's remaining declaratory judgment claim is **MOOT**.

C.     *Whether to Dismiss or Stay the Case*

Because the Court finds that this case should be compelled to arbitration, the Court next considers whether to stay or dismiss the proceedings pending the outcome of arbitration. The FAA provides that "upon any issue referable to arbitration under an agreement," the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. However, "dismissal, as opposed to a stay pending arbitration, is proper 'when all of the issues raised in the district court must be submitted to arbitration." *Rainey v. Citigroup, Inc.*, 779 F. App'x 258, 259 (5th Cir. 2019) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)). Here, aside from his moot claim for a declaratory judgment, all of Noel's claims against Defendants must be submitted to arbitration. Therefore, the Court concludes that dismissal of this case is proper.

## IV.

### CONCLUSION

For the reasons described above, the Court **GRANTS** Defendants' Motion to Compel and **DISMISSES WITH PREJUDICE** this case. Specifically, the Court **ORDERS** the following: (1)

Noel's declaratory judgment claim is **MOOT**; (2) Noel must arbitrate all remaining claims against Defendants.


   SO ORDERED.

   SIGNED: September 9, 2022.

          JANE J. BOYLE
          UNITED STATES DISTRICT JUDGE